Rena Nassr & another[1] vs. Commonwealth;
Alfred Nassr, third-party defendant.

Bristol.  December 4, 1984. — May 9, 1985.

Present: Hennessey, C.J., Liacos, Abrams, Lynch, & O'Connor, JJ.

*Eminent Domain*, What constitutes taking. *Public Health. Nuisance. Hazardous Waste. Restitution.*

Action by the Commonwealth in entering upon privately owned land for the purpose of removing extensive chemical contamination consisting of various forms of hazardous waste was a lawful exercise of its police power to maintain the public health, and did not constitute a "taking" which would entitle the owners to compensation. [770-772]

The Legislature, in enacting G. L. c. 21, § 27 (14), which provided authority for the Commonwealth to remove from land any harmful "spillage, seepage or discharge" and to collect its costs for doing so, did not intend to alter any rights that the Commonwealth possessed at common law to recover from private persons its costs of removing chemical contamination. [772-774]

The owners of land had a duty to abate a public nuisance which their lessee had created by improperly disposing of hazardous chemical waste. [774-776]

On a claim by the Commonwealth against the owners of land to recover the costs of removing extensive chemical contamination, the Commonwealth could not prevail on the theory that it was entitled to restitution from the owners, in the absence of evidence that it had acted with the intent to seek reimbursement. [776-778]

Civil action commenced in the Superior Court Department on July 2, 1980.

The case was heard by *Dennis L. Collari*, J., sitting under statutory authority.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

---

[1] San-Man Corp.

*Lee L. Bishop*, Assistant Attorney General (*Raymond G. Dougan*, Assistant Attorney General, with him) for the Commonwealth.

*Jeffrey S. Entin* for the plaintiffs.

LIACOS, J. These actions arose out of the discovery of an unlicensed hazardous waste operation on land owned by the plaintiffs and an extensive cleanup of that land by State and local officials. The plaintiffs, Rena Nassr and the San-Man Corp. (San-Man), sued the Commonwealth, claiming that the Commonwealth had trespassed on the plaintiffs' land and created a nuisance. The Commonwealth filed a counterclaim against the plaintiffs, and a third-party complaint against Alfred Nassr, former treasurer of San-Man and husband of Rena Nassr. The Commonwealth alleged that the plaintiffs and the third-party defendant were liable for civil penalties under G. L. c. 21, §§ 42, 57, 58, for illegal storage and disposal of oil and hazardous material, and for the costs of the cleanup operation under G. L. c. 21, §§ 27 (14), or, alternatively, for restitution because of the benefits conferred on them by the Commonwealth's cleanup efforts. The case was tried without a jury in the Superior Court in Bristol County on November 6, 1981. On March 2, 1983, the trial judge issued written findings of fact and conclusions of law. He entered judgment for the defendant in the original action, and for the plaintiffs and the third-party defendant in the counterclaim and third-party complaint. The Commonwealth and the plaintiffs both appealed. We transferred the cases to this court on our own motion.

We summarize the judge's findings. The plaintiff Rena Nassr owns a ten-acre parcel of land in Freetown, which she leases to the plaintiff San-Man. The third-party defendant, Rena Nassr's husband Alfred Nassr, was treasurer of San-Man and directed its operations until he retired in 1980. San-Man owns a 1,200 foot warehouse on the property. The warehouse is divided into six separate sections. In 1978, San-Man rented a section of the warehouse to Harold Mathews, doing business as H. & M. Drum Co., Inc. San-Man also rented five trailers to Mathews. There was no written lease between Mathews and San-Man.

In April, 1979, employees or agents of Mathews were discovered dumping liquid on the ground at about 500 to 1,000 feet from the end of the portion of the building leased to Mathews. Further investigation by Federal, State, and local officials revealed a large liquid lagoon, areas of discolored earth, barrels, and trailers containing barrels. High concentrations of volatile organic materials including tetrachloroethylene, trichloroethylene, trichloroethane, and toluene were discovered at the site. The section of the warehouse rented to Mathews contained about 750 barrels of liquid material, some of which were leaking. The barrels contained volatile organic materials. There was a risk of groundwater contamination, which was not realized because of a layer of clay in the subsoil, although contamination could have occurred through future perforations of the clay layer. There was a serious risk, also not realized, of accidental on-site ignition in the warehouse, which would have caused fires and explosions and would have endangered human life. The materials found at the site, when absorbed through the skin, ingested through water consumption, or inhaled, could cause damage to the central nervous system, the liver, and the kidneys, and, through extended exposure, could cause cancer.

On discovery of this condition, State and local officials padlocked Mathews's section of the warehouse and maintained a security guard. They received permission from the owners to enter the land several times in April, 1979, in order to conduct the cleanup operation. The Commonwealth's cleanup operation lasted until October, 1980.

The judge found that Mathews had been disposing of hazardous waste without a license, and that a public nuisance was created by the storage and disposal of the waste. He also found that Alfred and Rena Nassr had no knowledge of the dumping operation until it was discovered by police officers in April, 1979. Alfred and Rena Nassr did not act to remove the waste, nor did they offer at any point to do so. The Commonwealth would have allowed them to conduct a cleanup operation. The judge found, however, that Alfred and Rena Nassr cooperated with the Commonwealth in the cleanup operation and "acted

reasonably." The judge found "no evidence . . . that the Commonwealth undertook its activities with the intent to seek reimbursement from the plaintiffs or the third party defendant."

1. *The appeal by Rena Nassr and San-Man.* In their complaint, the plaintiffs alleged that the Commonwealth had trespassed on their land and had created a nuisance thereon. The judge ruled that there had been no trespass and that the Commonwealth had a "right and duty to abate the nuisance" on the land. On appeal the plaintiffs now claim that the Commonwealth's cleanup operation constituted a "taking" of their property, for which they are entitled to just compensation. They argue that, for the period during which the Commonwealth engaged in its cleanup operation (April, 1979, to October, 1980) they are entitled to the reasonable rental value of the section of the warehouse which was rented to Mathews.

Putting aside the question whether the plaintiffs' taking argument was properly raised below, and hence is properly before us, see *McLeod's Case*, 389 Mass. 431, 434 (1983), we conclude that the plaintiff's claim of a taking is without merit.

"In deciding whether a particular governmental action has effected a taking, [we focus] . . . both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole . . . ." *Penn Cent. Transp. Co.* v. *New York City*, 438 U.S. 104, 130-131 (1978). In this case, the Commonwealth acted under the authority of G. L. c. 21, § 27 (14),[2] to remove the hazardous material and thereby

---

[2] General Laws c. 21, § 27, as amended by St. 1979, c. 705, § 2, provides in part: "It shall be the duty and responsibility of the division [of water pollution control] to enhance the quality and value of water resources and to establish a program for prevention, control, and abatement of water pollution. Said division shall: . . . (14) Undertake immediately whenever there is spillage, seepage or other discharge of oil or hazardous material into or proximate to any of the waters of the commonwealth or into any offshore waters which may result in damage to the waters, shores or natural resources utilized or enjoyed by citizens of the commonwealth to cause said spillage, seepage or discharge to be contained and removed by whatever method it considers best."

See also G. L. c. 21, § 40, as amended through St. 1979, c. 705, § 3, which granted to the division of water pollution control the right of entry

to prevent the risks of groundwater contamination, fires and explosions, and life threatening disease. The Commonwealth's actions were classic exercises of the State's police power to maintain the public health. See *Davidson* v. *Commonwealth*, 8 Mass. App. Ct. 541 (1979) (action of the Commonwealth in taking over operation of a nursing home after Governor had declared a public health emergency at the nursing home was a lawful exercise of police power and did not amount to a taking).

The fact that the Commonwealth temporarily occupied the portion of the plaintiffs' land which was contaminated while it conducted the cleanup procedures hardly transforms this exercise of police power into an exercise of the eminent domain power. As the Supreme Court of the United States has stated, "[W]here the public interest is involved preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property." *Miller* v. *Schoene*, 276 U.S. 272, 279-280 (1928). See *National Bd. of YMCA* v. *United States*, 395 U.S. 85 (1969). "[T]he entry by firemen upon burning premises cannot be said to deprive the private owners of any use of the premises." *Id.* at 93.

Moreover, the plaintiff's claim that the Commonwealth used their warehouse to "store the barrels of hazardous waste pending clean-up" receives no support from the judge's findings. He specifically found that "[t]he time involved for removal as well as the means were reasonable." He also found that "[f]rom November of 1979 and for the next twelve months state officials removed and disposed of the chemicals from the warehouse and the contaminated soil." Nothing in the judge's findings suggests that the Commonwealth used the warehouse to "store" the waste. On the contrary, the judge found that the presence

"upon any property, public or private" in carrying out its responsibilities under G. L. c. 21, § 27 (14).

In 1983, the Legislature struck out G. L. c. 21, § 27 (14), and the provision of G. L. c. 21, § 40, quoted above. St. 1983, c. 7, §§ 2, 3. See *infra* at 774. The parties do not dispute, however, that G. L. c. 21, § 27 (14), is the operative statute for this case.

of the barrels in the warehouse constituted a public nuisance because of the serious possibility of an explosion.

The plaintiffs' claim that they were denied the reasonable rental value of the warehouse while the Commonwealth occupied part of their land sounds a particularly hollow ring in light of the judge's findings that both the warehouse and the liquid lagoon presented serious health risks, and that the plaintiffs did not act to, nor offer to, clean up the waste, but rather permitted the Commonwealth to do so. The plaintiffs' claim fails. The warehouse was in no condition to be rented until it was cleaned up.

2. *The Commonwealth's appeal.* The Commonwealth appeals the judge's ruling that the plaintiffs and the third-party defendant are not liable to the Commonwealth for the costs of the cleanup operation. In its complaint, the Commonwealth alleged liability for costs under G. L. c. 21, § 27 (14), and under the common law. The Commonwealth has not appealed the ruling of no liability on the statutory claim.[3] Before this court, the Commonwealth pursues exclusively its argument that the plaintiffs are liable at common law for the "costs" of cleanup.[4] In essence, the Commonwealth argues that the plaintiffs had a common law duty to abate the nuisance on their land; that the Commonwealth performed the plaintiffs' duty for them; and that the plaintiffs will be unjustly enriched if they are permitted to retain the benefit which was conferred upon them without paying compensation.

---

[3] Nor does the Commonwealth appeal the judge's ruling that the plaintiffs are not liable for civil penalties under G. L. c. 21, § 42.

[4] The Commonwealth's brief argues both that at common law the plaintiffs are liable for the "costs" of cleanup and that they are liable on a theory of "unjust enrichment." The Commonwealth argues, in effect, that the plaintiffs are liable under a theory of unjust enrichment (restitution) for the Commonwealth's expenditures. Costs, however, are not the proper measure of damages under an unjust enrichment theory of recovery. Thus, despite the confusing language in the Commonwealth's brief, we will treat their common law claim as one for restitution, the proper measure of recovery for which is the reasonable value of the benefit conferred. Restatement of Restitution § 1 comment a (1937) ("Ordinarily, the measure of restitution is the amount of enrichment received . . . ").

Before we examine the merits of the Commonwealth's common law claim, we first must ask whether the common law was altered in any way by G. L. c. 21, § 27 (14). General Laws c. 21, § 27 (14), as appearing in St. 1979, c. 705, § 2, provided extensive authority for the Commonwealth to clean up any "spillage, seepage or other discharge of oil or hazardous material" and to collect the costs of the cleanup from "the person responsible for causing such spillage, seepage or discharge" and "all persons who owned or controlled the oil or hazardous material or who owned or controlled or leased the vessel, tank, pipe, hose or other container in which the oil or hazardous material was located when the spillage, seepage or discharge occurred." The question which concerns us here is whether the Legislature, in enacting this comprehensive statute relative to the cleanup of the spillage, seepage, and discharge of, inter alia, hazardous material, intended to replace, or in some way alter, the common law. We conclude that the Legislature did not so intend.

In arriving at this conclusion we first note that G. L. c. 21, § 27 (14), nowhere stated that it provided an exclusive remedy for the Commonwealth to recover for its cleanup operations. Moreover, G. L. c. 21, § 42, as appearing in St. 1973, c. 546, § 8, which provides for penalties against discharges, states definitively, "Nothing in [c. 21] shall be construed as adversely affecting the rights of any person to secure judicial relief against actual or potential waste dischargers under other rules or provisions of law." While the landowners in this case are not dischargers of waste, and thus this section does not answer our question directly, this section elucidates the Legislature's general intent that the provisions of the Massachusetts Clean Waters Act, G. L. c. 21, §§ 26-53, complement, rather than replace, common law rules of liability. See also G. L. c. 21, § 46, as appearing in St. 1973, c. 546, § 12.

Our conclusion that G. L. c. 21, § 27 (14), was not intended to provide exclusive authority for the Commonwealth to recover for its cleanup operations is buttressed by an examination of the Massachusetts Oil and Hazardous Material Release Prevention Act, G. L. c. 21E, §§ 1-13, inserted by St. 1983, c. 7, § 5.

General Laws c. 21E, §§ 1-13, was enacted "to clarify and improve the commonwealth's capability for responding to releases of oil and hazardous material and to recover response costs from persons responsible for releases for which it has incurred such costs." St. 1983, c. 7, emergency preamble. In enacting this statute, the Legislature struck out G. L. c. 21, § 27 (14). St.1983, c. 7, § 2.

Section 13 of St. 1983, c. 7, established a "special commission . . . for the purpose of making an investigation and study relative *to determining the adequacy of existing common law* and statutory remedies available to the commonwealth to recover its costs of assessing, containing and removing oil and hazardous materials released or threatened to be released into the environment and to any other person for damage, injury, loss or other harm suffered as a result of such release of oil or hazardous material" (emphasis added). In setting up a commission with the task of examining, inter alia, the common law, the Legislature clearly contemplated the continuing existence and use of the common law in the field of hazardous waste cleanup. We think it clear that the Legislature did not intend to eliminate common law bases of liability when it enacted G. L. c. 21, § 27 (14).

We now address the Commonwealth's common law claim.[5]

a. *The plaintiffs' duty to abate the nuisance.* The trial judge found that the unlicensed hazardous waste operation on the plaintiffs' land created a public nuisance. He also found that

---

[5] We note that G. L. c. 21E, §§ 4, 5, expands the Commonwealth's power to conduct cleanup activities and to collect for the costs of such cleanup activities. Liability for cleanup costs extends to, inter alia, the owner of a site where there is a release or where hazardous material is stored and disposed of and where there is the threat of release. G. L. c. 21E, § 5 (a) (1) & (2). The owner may argue as a defense to liability that the release or threat of the release was due to a third party, if the owner establishes his own due care and compliance with statutory notification requirements. *Id.* at § 5 (c) (3). Even if the owner successfully argues this defense, however, he is liable for "such expenses only to the extent of the value of the property" following the Commonwealth's cleanup. *Id.* at § 5 (d). Thus, our common law analysis in this case may be obviated by this new statute for future cases.

the plaintiffs did not create this nuisance. The plaintiffs assert ownership and control as of April, 1979, of the premises which previously had been let to Mathews.[6] We assume, therefore, that Mathews's leasehold interest terminated in April, 1979. Thus, as of April, 1979, the plaintiffs had full ownership and control of the real estate. The judge's finding that the plaintiffs did not create this serious public nuisance does not insulate the plaintiffs from the duty to abate the nuisance.

It is a well-established rule that "[i]t is the duty of the owner to guard against the danger to which the public is thus exposed, and he is liable for the consequences of having neglected to do so, whether the unsafe condition was caused by himself or another." *Gray* v. *Boston Gas Light Co.*, 114 Mass. 149, 153 (1873). Put more succinctly, "[O]ne who continues a nuisance is liable as well as he who establishes it." *Fuller* v. *Andrew*, 230 Mass. 139, 146 (1918). Thus, even though the plaintiffs did not create the hazardous waste dump, the fact of their ownership of the land exposes them to potential liability for the hazardous conditions on their land, at least as of April, 1979. See Restatement (Second) of Torts § 366 (1965);[7] 2 F. Harper & F. James, Torts §§ 27.19, 27.20 (1956).[8] See also

---

[6] In seeking the reasonable rental value for the period from April, 1979, to October, 1980, of the premises previously let to Mathews, the plaintiffs in effect state that Mathews no longer possessed a leasehold interest in the premises as of April, 1979.

[7] Restatement (Second) of Torts § 366 provides: "One who takes possession of land upon which there is an existing structure or other artificial condition unreasonably dangerous to persons or property outside of the land is subject to liability for physical harm caused to them by the condition after, but only after, (a) the possessor knows or should know of the condition, and (b) he knows or should know that it exists without the consent of those affected by it, and (c) he has failed, after a reasonable opportunity, to make it safe or otherwise to protect such persons against it."

Comment b to § 366 states: "The rule stated in this Section . . . applies to a lessor resuming possession at the expiration or other termination of the lease."

[8] "[E]ven if the injurious conduct or condition first occurred during a tenancy, the landlord would have the duty to outsiders to use care to discover and remedy the condition at the end of the tenancy." 2 F. Harper & F. James, Torts § 27.20, at 1527 n.12 (1956). Harper and James discuss nuisance as

*Hunt* v. *Lane Bros.*, 294 Mass. 582, 586-587 (1936) (land-owner had duty to inspect premises after work done by independent contractor "to ascertain whether any objects of peril to persons on the street" were left by the independent contractor); *Franchi* v. *Boulger*, 12 Mass. App. Ct. 376, 378 (1981) (successors in title, "although they did not create the nuisance, are liable for knowingly allowing it to continue"). Cf. *Maynard* v. *Carey Constr. Co.*, 302 Mass. 530, 533 (1939); *Abruzzese* v. *Arlington*, 7 Mass. App. Ct. 882 (1979).

Thus, under this rule, the Commonwealth could have sued the plaintiffs to abate the nuisance on their land if they did not clean it up after becoming aware of the nuisance. However, the Commonwealth, instead of waiting for the plaintiffs to clean up their land, entered the land and engaged in an extensive cleanup operation.

b. *The Commonwealth's restitution claim.* The Commonwealth argues that having performed the plaintiffs' duty for them, under the terms of the Restatement of Restitution § 115 (1937), it is entitled to restitution. Section 115 of the Restatement of Restitution, entitled "Performance of Another's Duty to the Public," provides : "A person who has performed the duty of another by supplying things or services, although acting without the other's knowledge or consent, is entitled to restitution from the other if (a) he acted unofficiously *and with intent to charge therefor*, and (b) the things or services supplied were immediately necessary to satisfy the requirements of public decency, health, or safety" (emphasis supplied).[9] See also *Keith*

---

grounded in negligence and state the rule as: "The occupier of land generally owes a duty of reasonable care to prevent activities and conditions on his land from injuring persons or property outside his land . . . ." *Id.* § 27.19, at 1521. They further explain: "[The] imposition of affirmative duties on land ownership or occupation is not new. It is a recognition that 'The occupation of land may involve disadvantages as well as advantages.' " *Id.* at 1523. "[N]uisance here means a condition unreasonably dangerous to the use of neighboring land or a public right, and the wrong consists in omitting to take reasonable steps to remedy the condition, so that this all sums up to a duty of affirmative care." *Id.* at 1524.

[9] Comment b to § 115 cites several examples of when the rule applies. One is when a person "removes an obstruction from or makes repairs upon

v. *DeBussigney*, 179 Mass. 255, 259 (1901) ("[W]hen the law imposes upon one an obligation to do something which he declines to do, and which must be done to meet some legal requirement, the law in some cases treats performance by another as performance for him, and implies a contract on his part to pay for it").

The Commonwealth has not shown that it is entitled to restitution under the terms of the rule which it urges us to apply. To make out a claim for restitution in these circumstances, the Commonwealth must show that it acted with intent to charge for its services. See *Albert* v. *Boston Mortgage Bond Co.*, 237 Mass. 118, 121 (1921); *Home Carpet Cleaning Co.* v. *Baker*, 1 Mass. App. Ct. 879, 880 (1974); Restatement of Restitution, *supra* § 115. The trial judge specifically found that there was "no evidence . . . that the Commonwealth undertook its activities with the intent to seek reimbursement from the plaintiffs or the third party defendant."

The Commonwealth argues correctly that an intent to charge may be inferred. See Restatement of Restitution § 113 ("Performance of Another's Noncontractual Duty to Supply Necessaries to a Third Person") comment e (1937) ("[I]n the absence of circumstances indicating intent to make a gift, it is inferred that a person supplying goods or rendering services intends to charge therefor"); *id.* § 114 ("Performance of Another's Duty to a Third Person in an Emergency") comment c ("The fact that the person acting is in the business of supplying the things or is acting in the course of his profession, is evidence of an intent to charge"). However, we cannot rule as matter of law that the judge was required to infer an intent to charge.

The Commonwealth argues that the judge's finding that there was no intent to charge is a finding of "mixed fact and law," and that in relying on this finding the trial judge was "in error as a matter of law." We disagree. The judge made a finding of

a public road which has become imminently dangerous to members of the traveling public, if the town or person whose duty it is to care for the road fails to do so." Another is "[t]he abatement of a serious public nuisance, such as the removal of a dead whale stranded on the shore close to a town."

fact.[10] He could have drawn the inference, but was not required to do so. The burden to put forth affirmative evidence on this point was on the Commonwealth, and it clearly has failed to fulfil that burden. There is nothing in the record before us to indicate that the judge's finding was erroneous. The judge's finding of fact is conclusive on the Commonwealth's restitution claim.

*Judgments affirmed.*

---

[10] The judge's memorandum contains twenty-seven "findings of fact" and sixteen "conclusions." The finding quoted in the text is termed a "conclusion." By its own terms, however, this finding is a finding of fact, and we are not persuaded otherwise because it is labeled a "conclusion." The basis for the classification of the various findings as "findings of fact" or "conclusions" is not at all clear from the memorandum.