R & Y, INC., and Josef Ressel,
Appellants/Cross–
Appellees,

v.

MUNICIPALITY OF ANCHORAGE,
Appellee/Cross–Appellant.

Nos. S–9315, S–9435.

Supreme Court of Alaska.

Sept. 7, 2001.

Lawrence V. Albert, Anchorage, for Appellants/Cross–Appellees.

Steven S. Tervooren, Hughes Thorsness Powell Huddleston & Bauman, LLC, Anchorage, for Appellee/Cross–Appellant.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Article I, section 18 of the Alaska Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." Did the Municipality of Anchorage (MOA) "take" or "damage" property near Blueberry Lake in protected wetlands when it restricted development in a twenty-foot-wide setback band that began eighty feet from the lake's shoreline, decreasing the value of four of the landowners' lots? When the landowners sued the MOA claiming inverse condemnation, the trial court applied the relevant factors and held that there was no "taking." We affirm because we conclude that the legitimacy of the MOA's interest in restricting development in wetlands outweighs the relatively minor impact its action had on the value of the land.

In its cross-appeal, the MOA claims that because it was the prevailing party, it was entitled to an award of attorney's fees and costs. We conclude that when a landowner does not prevail on an inverse condemnation claim, costs and fees awards are controlled by Alaska Civil Rules 79 and 82, and not Alaska Civil Rule 72(k). We therefore remand for consideration of the MOA's requests for attorney's fees and costs.

## II. FACTS AND PROCEEDINGS

In August 1970 Josef Ressel and Edward Young purchased approximately forty acres of undeveloped land in Anchorage for

$110,000.[1] They purchased the land for future development. It contained swampland and a shallow lake called Blueberry Lake. The only regulations then applicable to the land were the Greater Anchorage Area Borough's interim subdivision regulations and zoning ordinances. They zoned this property " 'U'—Unrestricted District." Owners of land zoned "U" could develop swampland and drain water bodies on their property. The "U" classification allowed the land to be put to any use that was not noxious, injurious, or hazardous. Prior to 1970 purchasers of swampland in Anchorage had drained and filled their property without any legal restrictions. When they purchased the property near Blueberry Lake, these landowners expected to be able to develop their land in part by draining and filling Blueberry Lake and surrounding swamplands.

In 1972 Congress passed the Federal Water Pollution Control Act, or Clean Water Act (CWA).[2] Under § 404(a) of the CWA, dredging or filling wetlands requires a permit from the United States Army Corps of Engineers.[3] In 1978 the MOA began implementing a coastal management plan; in 1982 it adopted the Anchorage Wetlands Management Plan (AWMP).[4] One objective of the AWMP was to simplify the regulation of wetlands. The AWMP classified wetlands as "developable," "conservation," or "preservation." The MOA could issue dredge and fill permits for wetlands classified as "developable." But the Corps retained exclusive permitting authority with respect to "preservation" wetlands. The AWMP also designated a 100–foot setback around Blueberry Lake.

The disputed land was part of an area known as Conner's Bog, designated under the AWMP as "preservation," with particular sub-areas designated as "developable."

The State of Alaska took about thirteen of the forty acres in 1979 for a highway project in exchange for compensation of about $808,000. The landowners sought to subdivide their remaining twenty-seven acres.

Following enactment of the AWMP in 1982, the landowners revised their subdivision design to avoid disturbing Blueberry Lake or the 100–foot setback area designated in the AWMP. Their final plat map replaced two lots and associated street access with an area of equivalent size known as Tract B. The landowners intended Tract B to encompass all of the "preservation" wetlands surrounding Blueberry Lake. Essentially all of Blueberry Lake and the "preservation" wetlands are located within Tract B. The final subdivision thus consisted of Tract A, Tract B, and Lots 1 through 7. The MOA approved the final subdivision plat in May 1983; that plat was recorded on May 12, 1983. Referring to Blueberry Lake, a note on the plat stated that "[n]o structures or fills shall be placed within 65' of the lake located within Tract B." [5]

With the "preservation" designation in effect, the landowners could develop Tract B only if the Corps of Engineers issued them a permit allowing them to do so. In August 1985 the landowners applied to the Corps for a § 404 permit to fill Blueberry Lake. The Corps denied the application after the State of Alaska, the MOA, and federal agencies objected.

---

1. Ressel and Young later formed R & Y, Inc. to hold title to various assets. The corporation issued shares to Ressel and Young. Young sold his shares to William Watterson and Mark Graber.

 Most of the other facts discussed in this part, including those concerning the purchase of this land, past zoning requirements, past development practices in Anchorage, the adoption of land use standards, and these landowners' expectations, were set out in an extensive pretrial stipulation.

2. Pub.L. No. 92–500, 86 Stat. 816 (codified at 33 U.S.C. § 1251, et seq. (1972)).

3. Section 404 is codified at 33 U.S.C. § 1344 (1986). Section 404(a) provides that "[t]he Sec-

retary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specific disposal sites."

4. Incorporated in 1975, the Municipality of Anchorage subsumed the City of Anchorage and the Greater Anchorage Area Borough. See Anchorage Municipal Charter §§ 1.02, 19.02(a).

5. The plat note also states that "Tract B shall be reserved for 15 months from the date of recording for purchase or acquisition by the Municipality in accordance with Section 21.80.135 of the Anchorage Municipal Code."

During the subdivision process in 1984–85, the landowners cleared a drainage ditch and placed fill on Lots 4 and 7, near Tract B. The landowners thought the fill occurred outside the sixty-five-foot setback line and obtained no § 404 permit. The United States Environmental Protection Agency (EPA) determined that the fill activity was unauthorized, issued two compliance orders, and demanded site restoration. Unsatisfied by the landowners' response, the EPA filed a federal enforcement action in 1988 and sought injunctive relief and civil penalties. In 1991 the United States District Court for the District of Alaska entered a stipulation and consent decree establishing that the appropriate boundary for federal purposes was an eighty-foot-setback from Blueberry Lake. In drafting the consent decree, the Justice Department reasoned that the Corps' general permit required a fifteen-foot buffer from the "preservation" wetlands. Because the setback for the "preservation" wetlands was sixty-five feet and the buffer zone was fifteen-feet wide, the federal consent decree effectively precluded construction within eighty feet of the lake's shoreline, rather than the subdivision plat's sixty-five-foot setback.

In 1990, under authority of the Corps' general permit, the MOA issued the landowners an MOA permit that allowed them to fill Lots 5 and 6 and precluded placing fill within 100 feet of the Blueberry Lake shoreline. In 1991 the landowners obtained a separate permit from the MOA to fill portions of Tract A. This permit also precluded fill within 100 feet of the shoreline of the lake. These setback requirements exceeded both the sixty-five-foot setback described in the 1983 subdivision plat and the eighty-foot setback required by the 1991 federal consent decree. Because the MOA's 100–foot setback requirement extended twenty feet beyond the federal consent decree's eighty-foot restriction, and thus created an additional no-fill area twenty feet wide, we will sometimes refer to this area as the "twenty-foot-wide setback band." It is this band which is at the heart of this appeal.

MOA and Corps regulations have prevented the development of Tract B. The landowners have also been prohibited from developing lands within the setbacks imposed variously by the MOA's subdivision approval, the EPA consent decree, and the MOA's subsequent permitting under the Corps' general permit. According to land appraisers whose opinions were admitted as evidence at trial, the economic loss to the landowners as of May 1983, when the subdivision was approved, was $483,800, assuming a sixty-five-foot setback and a complete prohibition on use of Tract B. The loss was $563,200, assuming a 100–foot setback and a complete prohibition on use of Tract B.[6]

The landowners filed an inverse condemnation action against the MOA in 1993. They alleged that the MOA's 1983 subdivision approval resulted in a taking of both Tract B and the setback area affecting Lots 4 through 7. The MOA's answer denied any taking. Superior Court Judge Sen K. Tan conducted a bench trial and issued a memorandum decision holding that there had been no taking. As part of its analysis, the trial court estimated the economic impact attributable to MOA action in requiring the twenty-foot-wide setback band to be between 1.5% and 2% of the value of the property. The landowners unsuccessfully moved for reconsideration. The superior court entered final judgment in September 1999. The MOA sought awards of attorney's fees and litigation costs, but the trial court denied its requests.

The landowners appeal, arguing that there was a compensable taking and that the MOA is liable for their loss attributable to the twenty-foot-wide setback band. The MOA cross-appeals the denial of its requests for litigation costs and attorney's fees.

III. *DISCUSSION*

 A. *Was the MOA's Restriction on Development in the Twenty–Foot–Wide Setback Band a Compensable "Taking"?*

 1. *Standard of review*

 We apply our independent judgment in reviewing conclusions of law such as

---

6. These loss calculations were based on the May 1983 values of all subdivision lots before and after regulation.

the trial court's conclusion that the MOA's imposition of a setback band was not a compensable taking under the United States Constitution and the Alaska Constitution.[7] We review de novo questions of constitutional law,[8] and adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[9] We review the trial court's fact determinations, including the weight it gives to particular factors in the regulatory takings analysis, for clear error.[10]

## 2. Regulatory takings analysis

■ Article I, section 18 of the Alaska Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." Property owners enjoy broader protection under the Alaska Constitution than under the Fifth Amendment of the United States Constitution.[11]

■ Under both constitutions, if there has been no per se taking—either through physical invasion of land or regulation that has deprived the landowner of all economically valuable use of the land—case-specific analysis is necessary to determine whether a compensable taking has occurred.[12] Alaska courts engaging in this case-specific analysis consider four factors: (1) the character of the governmental action; (2) its economic impact; (3) its interference with reasonable investment-backed expectations; and (4) the legitimacy of the interest advanced by the regulation or land-use decision.[13] These are known as the *Sandberg* factors.[14]

## 3. Applying the factors

■ The trial court considered the landowners' claim that there were two categories of "takings": (1) the loss of use of Tract B, and (2) the partial loss of use of Lots 4, 5, 6, and 7 due to the setback requirement. The trial court analyzed both categories in light of the four *Sandberg* factors.

Although the landowners asserted in the trial court that the MOA took a much larger part of their property, in their appellate reply brief and at oral argument before us, their attorney made it clear that their appeal concerns only the twenty-foot-wide setback band beginning eighty feet from the shore-

---

**7.** See *Smith v. Ingersoll–Rand Co.*, 14 P.3d 990, 992 (Alaska 2000); *see also Zerbetz v. Municipality of Anchorage*, 856 P.2d 777, 778 (Alaska 1993) (affirming trial court's grant of summary judgment for municipality and holding that municipality's designation of property as "conservation wetlands" was not compensable taking).

**8.** See *Anchorage v. Sandberg*, 861 P.2d 554, 557 (Alaska 1993) (reversing grant of summary judgment for landowner and holding that municipality's purchase of park land in area of landowner's development, assembly votes against water and sewage districts, and decision not to participate in road improvement district did not constitute "taking").

**9.** See *State, Dep't of Revenue, Child Support Enforcement Div. v. Beans*, 965 P.2d 725, 730 (Alaska 1998).

**10.** See *State v. Alex*, 646 P.2d 203, 214 (Alaska 1982); *Osness v. Dimond Estates, Inc.*, 615 P.2d 605, 610 (Alaska 1980); *see also* Alaska R. Civ. P. 52(a).

**11.** See *Ehrlander v. State, Dep't of Transp. & Pub. Facilities*, 797 P.2d 629, 633 (Alaska 1990) ("'[Article I, section 18 of the Alaska Constitution] is to be interpreted liberally in favor of the property owner. The inclusion of the term 'damage' affords the property owner broader protection than that conferred by the Fifth Amendment to the Federal Constitution.") (citing *State v. Doyle*, 735 P.2d 733 (Alaska 1987)). The Fifth Amendment to the United States Constitution provides in part: "nor shall private property be taken for public use, without just compensation."

**12.** See *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (explaining that in determining whether government regulations go too far for purposes of Fifth Amendment, courts must "engag[e] in . . . essentially ad hoc, factual inquiries"); *Sandberg*, 861 P.2d at 557 (citing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). *See also Palazzolo v. Rhode Island*, 533 U.S. ——, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (affirming state court rejection of *Lucas* takings claim where state regulated wetlands but did not deprive owner of all economic use of his property, and remanding for consideration of owner's claims under *Penn Central* analysis).

**13.** See *Sandberg*, 861 P.2d at 557; *see also Beluga Mining Co. v. State, Dep't of Natural Resources*, 973 P.2d 570, 575 (Alaska 1999) (citations omitted); *Cannone v. Noey*, 867 P.2d 797, 800 (Alaska 1994) (citations omitted).

**14.** *Sandberg*, 861 P.2d at 557.

line of Blueberry Lake and extending to 100 feet. We therefore need not consider whether the MOA prevented the landowners from developing Tract B, and we limit our attention to the effect of the twenty-foot-wide setback band on Lots 4 through 7.

The landowners argue that the trial court incorrectly applied the four *Sandberg* factors. They claim that, as a matter of law, the court erred by de-emphasizing the reasonable investment-backed expectations and economic impact factors and overemphasizing the fact that the MOA setbacks caused only minor economic loss. They contend that a compensable taking has occurred whenever there is interference with reasonable investment-backed expectations or damage to property, regardless of how "minor" the economic damage.

We reject this contention because it is contrary to the settled law of the United States and the State of Alaska. And we conclude that the trial court did not err in applying the *Sandberg* factors.

### a. *Character of the MOA's action*

Concerning the character-of-governmental-action factor, the trial court concluded that the MOA's decisions affected the subdivision both indirectly and directly. By designating Blueberry Lake a "preservation" wetland and leaving it to the Corps to determine whether a § 404 permit was appropriate, the MOA's decisions had an indirect impact. By imposing a sixty-five-foot setback, the MOA directly affected the land. The trial court also reasoned that the Corps, by denying the 1985 § 404 permit application to drain and fill the lake, affected both Tract B and the four lots: "[i]f the Corps had granted [the] § 404 application, there would be no lake and no setback requirements." It further found that there was federal intervention, leading to the federal consent decree and the eighty-foot setback. It concluded that the MOA's conduct regarding the land was "mostly indi-

rect." The trial court did not separately consider the character of the MOA's imposition of the additional twenty-foot-wide setback band.

### b. *Economic impact of the MOA action*

Concerning the economic impact factor, the trial court concluded that "opportunity for development has been lost to Tract B of the property and the designated setback areas on Lots 4 to 7." It found that "the lion's share of the economic impact" on the subdivision was due to the Corps' denial of the § 404 permit application.[15]

On appeal, the landowners argue that the pertinent economic impact is that caused by the twenty-foot-wide setback band. Therefore, the relevant diminution in value must be measured by the loss attributable to the MOA's requirement for the setback band that begins eighty feet from the shoreline and extends to 100 feet. That loss must be compared to the value of the entire subdivision, Tract A, Tract B, and Lots 1 through 7.[16]

The trial court estimated that the twenty-foot-wide setback band diminished the value of the relevant property by 1.5% to 2%. The court did not explain how it calculated this estimate. But there was ample evidence before the trial court to support this estimate. We also conclude that the loss in value, however calculated, was small enough to support the trial court's conclusion that the MOA's actions did not amount to a compensable regulatory taking.

Although the trial evidence regarding the financial effect of requiring the additional twenty-foot-wide band is obscure, the evidence permits relatively precise calculation of the incremental impact caused by extending the sixty-five-foot setback to 100 feet. Relying upon King's expert testimony, the trial court reasoned:

**15.** The landowners' expert, Franklin King of the Accuval Resco Appraisal Company, Inc., opined that the original sixty-five-foot restriction reduced the market value of Tract B to $0. That necessarily means that any further restriction by the MOA caused no additional diminution in the value of Tract B.

**16.** The parties stipulated at trial that the parcel of land "relevant" to the takings inquiry encompassed Tract A, Tract B, and Lots 1 through 7.

[W]ith a curved 65 foot setback, the value before governmental action is $2,958,900 and the value of the land after governmental action is $2,475,100, a resultant loss in value of $483,800 or 16.35%. Of the loss in value of $483,800, $392,000 or 13.23% is attributable to Tract B, *with the remaining $91,800 or 3.2% attributable to the [sixty-five-foot] setback requirement.*

(Emphasis added.) As the trial court recognized, "the experts did not testify regarding the economic impact of a 80 foot setback." But by using the appraisal the court found to be more accurate, the trial court could easily calculate the impact of extending the sixty-five-foot setback by thirty-five feet. That appraisal, prepared by the landowners' expert, found that a 100–foot setback would reduce the value of the land to $2,395,700, a loss in value of $563,200. Again subtracting the $392,000 loss in value for Tract B, the loss in value for Lots 4 through 7 attributable to the 100–foot setback is $171,200, or 5.79% of the total value of the subdivision. By subtracting the loss attributable to the sixty-five-foot setback from the loss attributable to the 100–foot setback, the incremental loss in value caused by extending the sixty-five foot setback to 100 feet can be calculated. It is $79,400 ($171,200—$91,800); that is 2.68% of the total value of the subdivision property.

The trial court recognized that the evidence did not permit a direct calculation of the impact of the last twenty feet of that thirty-five-foot-wide band, i.e., the twenty-foot-wide setback band lying between the federal consent decree's eighty-foot setback and 100 feet. But the trial court probably estimated the impact of the twenty-foot-wide

setback band by somehow prorating the loss in value caused by the entire thirty-five-foot-wide band. The trial court's estimate—that the impact was "in the range of 1.5% to 2% of the value of the property"—is consistent with a prorational estimate. Given its findings about the impacts caused by the sixty-five and 100–foot setbacks, and the evidence that the entire thirty-five-foot band increased the impact by about 2.68% of the value of the relevant property, the trial court may have multiplied the latter percentage by $^{20}/_{35}$ to estimate what part of the loss in value was attributable to the setback band that formed the last twenty feet of the thirty-five-foot band. The result would have been about 1.5%, a figure within the 1.5% and 2.0% range the trial court mentioned in footnote 9 of its opinion.[17]

Further, footnote 23 of the landowners' opening brief estimates a loss in value that confirms that the economic impact of the additional twenty-foot setback is very small relative to the value of the property.[18] Their estimate is consequently consistent with the estimate derived by the trial court. Likewise, the loss in value of Lots 4 through 7 caused by the entire thirty-five-foot band lying between sixty-five and 100 feet was about 2.68% of the subdivision property. This figure was itself so small that it would support the trial court's balancing analysis.

We conclude that there was ample support for the trial court's estimate of the economic impact of the twenty-foot-wide setback band.

### c. *The landowners' expectations*

The trial court found that "the Owners' expectations were reasonable and investment

---

**17.** The trial court may have applied some more sophisticated method to estimate the impact of the twenty-foot-wide band. For example, the lake is irregular in shape, but its area, as estimated by a surveyor, allows a rough assumption that it has a radius of about 233 feet. Assuming perfect concentric circles, that figure can be used to estimate and compare the areas of the band lying between sixty-five and 100 feet of the shoreline and the band lying between eighty and 100 feet of the shoreline. By applying the resulting ratio to $79,400 (the loss in value caused by the entire thirty-five foot band), the loss in value the twenty-foot-wide setback band caused to Lots 4 through 7 may be estimated. The result is an

estimate of about 1.52% of the value of the relevant property.

**18.** The landowners there estimate their damages at about $66,000. Given the context of their discussion, this appears to be their estimate of the loss in value caused by the "marginal 81–100 foot setback area." If so, the economic impact is 2.23% of the value of the subdivision property. If they actually intend the $66,000 estimate to apply only to the first fifteen feet of the thirty-five-foot setback, the value of the remaining twenty-foot band would be even less, $13,400 ($79,400–66,000), or .452% of the value of the property.

backed." This finding was favorable to the landowners. The MOA has not challenged this finding on appeal, and we accept it for purposes of reviewing the trial court's analysis of the *Sandberg* factors.

#### d. *Legitimacy of the MOA's interest*

The trial court found that the MOA has a "legitimate interest in [its] land use decisions":

> The land use decisions here have to do with the protection of wetlands. The passage of the CWA as well as of the state ACMP and the municipal AWMP all speak to the legitimacy of the governmental action.

> There has certainly been a diminution of the total acreage of wetlands in the Anchorage area since the 1950's and because such wetlands are a valuable resource in and by themselves, the MOA has a legitimate interest in such land use decisions.

The landowners do not challenge this finding. We therefore accept this finding for purposes of this appeal.

But given the importance of this factor to the trial court's analysis, we also note that no plausible argument could be made that the MOA has no legitimate interest in land-use decisions concerning wetlands.

#### e. *Weighing the factors*

Finally, the trial court concluded that "the factors must be weighed to decide whether a 'taking' has occurred." It reasoned that, "[s]ince the actual extent of the impact of the MOA's decisions is 'so unclear, the severity of the economic impact and the reasonableness of [the landowners'] expectations concerning development plans must weigh heavily in [the landowners'] favor.'"[19] The trial court found that the MOA setback requirement caused economic loss to the landowners' property. But, in balancing the *Sandberg* factors, the trial court found that no compensable taking or damage had occurred:

> On balance ... factors two and three do not weigh heavily enough to tip the scales in favor of the Owners. In this case, Owners were able to realize most of their investment backed expectations and have done so through the sale of Subdivision property. The reduction in value, although significant in terms of actual dollars, represents a small percentage when viewed in the context of the entire property. Lastly, I find that the land-use decisions here [serve] a legitimate purpose. Therefore I find that private property has not been damaged or taken in this case.

■ The landowners would find a compensable taking whenever the government interferes with reasonable investment-backed expectations, or damage to property has occurred, even if the economic damage is "minor." But that rule would be inconsistent with established takings doctrine and the economic policies underlying that doctrine. The takings doctrine of this court and the United States Supreme Court clearly holds that, where there has been no physical invasion of property, a per se taking will not be found except upon a showing that all economic value of a particular piece of property has been destroyed.[20] The landowners also suggest that a de facto taking can be established without full consideration of the *Sandberg* factors when a government's action has damaged private property even when the damage has not destroyed all economic value of the land. This proposed rule offends established takings doctrine, which, outside a narrow set of circumstances resulting in per se takings, requires courts to engage in case-specific analysis guided by the *Sandberg* factors. We decline to adopt the landowners' alternative legal rule.

Rather, we agree with the trial court that even under the more far-reaching terms of the Alaska Constitution, the MOA's regulatory action did not amount to a compensable taking of the landowners' property.

■ Alaska case law does not elaborate on how the *Sandberg* factors are to be weighed against each other. But it is helpful to consider the policies that animate the fed-

---

19. The trial court there quoted *Sandberg*, 861 P.2d at 558.

20. *See Lucas*, 505 U.S. at 1015–16, 112 S.Ct. 2886 (citations omitted); *Sandberg*, 861 P.2d at 557.

eral doctrine from which the *Sandberg* factors were adopted.[21] At one end of the spectrum, the cases recognize limits on the rightful uses to which owners may put their private property. "Long ago it was recognized that 'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community.'"[22] Furthermore, the doctrine recognizes that in order to protect the public welfare, governments may exercise their police powers, occasionally impairing the use and value of private property.[23] This policy is present in the law of the states as well.[24]

■ Nevertheless, courts also recognize limits on the exercise of police powers that encroach on property rights. "[T]here is no dispute about the proposition that a regulation which 'goes too far' must be deemed a taking."[25] Thus, regulatory takings doctrine requires courts to reconcile these policies. The reconciling principle employed in the federal doctrine focuses on whether the challenged regulatory action unfairly allocates the burden of preserving the public welfare

to a particular landowner. "The determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest."[26]

■ Although no precise rule determines when property has been taken,[27] the question necessarily requires a weighing of private and public interests.[28] Professor Robert Ellickson explains the policy underlying the doctrine: "[t]akings clauses largely aim to prevent horizontal inequity stemming from a government's decision to impose a heavy burden on a few citizens instead of spreading that burden through the tax system."[29] Professor Ellickson suggests that any land use activity can be appraised in terms of its relative desirability to neighbors.[30] He notes that government land-use regulations that restrict neighborly activity (activity that does not impose externalities that are worse than normal, like commercial development in a commercial development zone) are most like-

**21.** *See Sandberg*, 861 P.2d at 557 (identifying source of four factors, first identified by us in *State, Dep't of Natural Resources v. Arctic Slope Reg'l Corp.*, 834 P.2d 134, 138–39 (Alaska 1991), and derived from *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000–05, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), and *Agins v. City of Tiburon*, 447 U.S. 255, 260–61, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)).

**22.** *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491–92, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (quoting *Mugler v. Kansas*, 123 U.S. 623, 665, 8 S.Ct. 273, 31 L.Ed. 205 (1887)).

**23.** *See, e.g., Keystone*, 480 U.S. at 485–93, 107 S.Ct. 1232 (coal mine); *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 590–97, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962) (rock quarry excavation); *Miller v. Schoene*, 276 U.S. 272, 277–81, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (infectious tree disease); *Hadacheck v. Sebastian*, 239 U.S. 394, 404–14, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (emissions from factory); *Mugler*, 123 U.S. at 652, 8 S.Ct. 273 (intoxicating liquors); *see also Penn Cent. Transp. Co.*, 438 U.S. at 145, 98 S.Ct. 2646 (Rehnquist, J., dissenting) ("The question is whether the forbidden use is dangerous to the safety, health or welfare of others.").

**24.** Courts have consistently held that a state need not provide compensation when it diminishes or destroys the value of property by stopping illegal activity or abating a public nuisance. *See Pom-*

*pano Horse Club, Inc. v. State ex rel. Bryan*, 93 Fla. 415, 111 So. 801, 807 (1927) (gambling facility); *People ex rel. Thrasher v. Smith*, 275 Ill. 256, 114 N.E. 31, 32 (1916) ("bawdyhouse"); *MacLeod v. City of Takoma Park*, 257 Md. 477, 263 A.2d 581, 584 (1970) (unsafe building); *Nassr v. Commonwealth*, 394 Mass. 767, 477 N.E.2d 987, 990 (1985) (hazardous waste operation); *Kuban v. McGimsey*, 96 Nev. 105, 605 P.2d 623, 627 (1980) (brothel); *Eno v. City of Burlington*, 125 Vt. 8, 209 A.2d 499, 502–03 (1965) (fire and health hazard).

**25.** *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 328, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (Stevens, J., dissenting) (citing *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922)).

**26.** *Agins*, 447 U.S. at 260, 100 S.Ct. 2138.

**27.** *See Kaiser Aetna v. United States*, 444 U.S. 164, 174–75, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).

**28.** *See Agins*, 447 U.S. at 260–61, 100 S.Ct. 2138.

**29.** Robert C. Ellickson, *Takings Legislation: A Comment*, 20 Harv. J.L. & Pub. Pol'y 75, 82 (1996).

**30.** *See id.*

ly to trigger compensation under takings clauses.[31] Still, the government should be entitled to attempt to prove a defense that, in the long run, a practice of compensating in instances of this sort would not be in the interest of claimants in general, such as when the social desirability of the regulation is unquestionably strong or the transaction costs of rendering payment would be severe.[32] For example, Professor Ellickson explains that the government defense should succeed in justifying a non-compensable prohibition on the neighborly activity of growing wheat when the prohibition is applied to a wide set of landowners to produce a significant social benefit, i.e., when a state enacts a statewide ban on wheat farming to allow nature to remedy the effects of the previous year's dust bowl.[33]

The landowners in the present case could make a prima facie showing of a taking under Professor Ellickson's scheme because they have suffered economic loss due to a government regulation that prevents them from engaging in normal land use activities (commercial development in a commercial district). However, the MOA's setback restriction should not trigger compensation because it is part of a city-wide (indeed, nation-wide) wetlands preservation scheme which applies broadly to all landowners and which benefits both the public generally and the landowners in particular. Scientists and legislators have recognized the unique ecological

and economic value that wetlands provide in protecting water quality, regulating local hydrology, preventing flooding, and preventing erosion.[34] In preserving the valuable functions of wetlands, regulations like those of the MOA provide ecological and economic value to the landowners whose surrounding commercially-developed land is directly and especially benefitted by the functioning of Blueberry Lake.

The seminal decision of *Agins v. City of Tiburon*[35] is also illustrative. In *Agins*, the United States Supreme Court affirmed the California Supreme Court's judgment that a city's open-space land zoning ordinances, which restricted a previously purchased five-acre tract of land to single-family residences and open-space use, did not take the property without just compensation, where the zoning benefitted the landowners as well as the public by assuring careful and orderly development.[36] The *Agins* Court found it significant that "[t]here [was] no indication that the appellants' 5-acre tract [was] the only property affected by the ordinances," [37] and that the landowners "therefore [would] share with other owners the benefits and burdens of the city's exercise of its police power." [38]

Federal courts have rejected the landowners' "any economic loss is compensable" position in favor of the more nuanced *Agins*-type reasoning.[39] These decisions aspire ultimate-

31. *See id.*

32. *See id.* at 83.

33. *See id.*

34. *See, e.g.,* Paul Sarahan, *Wetlands Protection Post Lucas: Implications of the Public Trust Doctrine on Takings Analysis,* 13 Va. Envtl. L.J. 537, 538–39 (1994) (citing John Clark, *Coastal Ecosystem Management: A Technical Manual for the Conservation of Coastal Zone Resources* 32–33 (1977); Stephen M. Johnson, *Federal Regulation of Isolated Wetlands,* 23 Envtl. L. 1, 2–4, 30 (1993); J. Henry Sather, *An Overview of Major Wetlands Functions and Values* (1984)).

35. 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980).

36. *See Agins,* 447 U.S. at 257–59, 100 S.Ct. 2138.

37. *Id.* at 262, 100 S.Ct. 2138.

38. *Id.* These conclusions are consistent with Professor Ellickson's suggestion that generally applicable government regulations that secure an unquestionable social benefit on the entire community, and on regulated landowners in particular, should not be compensable. *See* Ellickson *supra* note 29.

39. *See, e.g., Robbins v. United States,* 40 Fed.Cl. 381, 385 (1998) (holding that federal designation of property as wetlands, which prevented landowners from maximizing profits, was insufficient to establish a deprivation of all economically beneficial use, and granting government's motion for summary judgment because "long-standing precedent holds that 'the mere diminution in a property's value, however serious, is insufficient to demonstrate a taking' ") (quoting *Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust,* 508 U.S. 602, 604, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 384, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (seventy-five

ly to allocate economic burdens and benefits fairly and will find an allocation fair when the disputed regulation: (1) applies broadly to many landowners; (2) directly benefits those that it burdens; and (3) permits burdened landowners to engage in viable alternative economic uses of their land.[40]

The Federal Circuit Court of Appeals employs a "reciprocity of advantage" test to determine when government regulations that reduce but do not entirely eliminate the economic value of land have gone too far and ought to be compensable.[41] This test is consistent with the *Agins* reasoning and Professor Ellickson's expository scheme. The Federal Circuit has explained:

> When there is reciprocity of advantage, paradigmatically in a zoning case, then the claim that the Government has taken private property has little force: the claimant has in a sense been compensated by the public program "adjusting the benefits and burdens of economic life to promote the common good." [42]

In determining whether a challenged government action produces a reciprocity of advantage and therefore ought not trigger compensation, the Federal Circuit instructs trial courts to consider whether there are "direct compensating benefits accruing to the property, and others similarly situated, flowing from the regulatory environment" or whether the "benefits, if any, [are] general and widely shared through the community and the society, while the costs are focused on a few." [43] In addition, trial courts may consider whether there are "alternative permitted activities economically . . . realistically available." [44] When government regulations permit such alternative economic uses, courts have consistently held that no compensation shall be due.[45]

The landowners also appear to argue here that the trial court erred in determining that, because the MOA's interest in wetlands regulation is legitimate, no taking could be found. But this was not the trial court's reasoning. The landowners have not shown that the trial court gave inadequate weight to the investment-backed expectations and economic impact factors. The trial court expressly made findings regarding these factors and explained that, because the econom-

percent diminution in value of land due to zoning regulation not compensable taking)); *see also Lucas*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798; *Keystone*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472; *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); *MacDonald, Sommer & Frates v. County of Yolo*, 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986); *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).

40. *See Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1570–71 (D.C.Cir.1994) (when regulation reduces some but does not eliminate all economic value of land, trial courts should determine whether regulation produces reciprocity of advantage and fairly allocates costs of public good) (citing *Euclid*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 and quoting *Agins*, 447 U.S. at 262–63, 100 S.Ct. 2138 (shared "benefits and burdens" of zoning ordinance), and *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646 ("adjusting the benefits and burdens of economic life to promote the common good")).

41. *See, e.g., id.* at 1570–71 (vacating Federal Court of Claims judgment in favor of landowner whose land diminished in value when he was denied CWA permit to mine limestone in wetlands and instructing trial court on remand to

undertake balancing of competing interests to determine whether compensable regulatory taking had occurred).

42. *Id.* (citing *Euclid*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 and quoting *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646).

43. *Id.* at 1571.

44. *Id.*

45. *See, e.g., Outdoor Sys., Inc. v. City of Mesa*, 997 F.2d 604, 607–08, 615–18 (9th Cir.1993) (reversing district court judgment in favor of landowner whose land diminished in value due to city no-sign ordinance prohibiting him from renting billboard space on his land and concluding that diminution in value was "insufficient to constitute a taking where the land may still be put to an economically viable use") (citations omitted); *see also Jentgen v. United States*, 228 Ct.Cl. 527, 657 F.2d 1210, 1211–13 (Cl.Ct.1981) (reasoning, where Corps of Engineers denied landowner permits to dredge and fill wetlands for residential development on sixty of eighty acres of land, that "the taking issue in these contexts is resolved by focusing on the uses the regulations permit," and concluding that there was no taking because landowner was permitted to develop twenty of his eighty acres of land).

ic loss was so minor, these factors did not weigh heavily enough to overcome the MOA's legitimate interest in wetlands preservation. The trial court correctly applied the law, and its finding of minor economic impact was both reasonable and supported by expert testimony establishing the value of the setback bands.

The crux of the landowners' complaint remains their view that every economic loss due to government regulation must be compensated, no matter how minor the loss. As we have seen, this is not the law. While some minor economic losses may indeed be compensable under our takings doctrine, not every such loss is compensable. A case-specific analysis, guided by the *Sandberg* factors and the underlying economic principle of equitable distribution of public burden and benefit, determines which losses are compensable. The trial court's decision is consistent with takings doctrine and its underlying principles. They recognize broad governmental authority to regulate in the public interest when that regulation does not unfairly allocate the burden of the public welfare to a particular private party. Here, as in *Agins,* the landowners were not singled out and made to suffer unduly burdensome economic loss.[46] Instead, they incurred only relatively minor economic loss due to generally applicable wetlands restrictions which govern all land use in Anchorage and benefit all landowners, including these landowners, by preserving the ecologically and economically valuable functions of wetlands.

The trial court took a rational and well-reasoned approach to this case. It appropriately considered the *Sandberg* factors and made reasonable findings regarding the value of the property actually in dispute. We conclude that its decision that there was no taking is supported by the evidence.

The landowners moved in June 2001 for leave to file memoranda addressing the United States Supreme Court's recent opinions in

Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers[47] and *Palazzolo v. Rhode Island,*[48] and for leave to file a motion to stay the appeal pending a possible application by the landowners to the Corps of Engineers for some unspecified relief from restrictions on developing the wetlands. We denied the motion to stay because the question here is whether the MOA's past actions in imposing the twenty-foot-wide setback band entitle the landowners to compensation. The Supreme Court's opinions do not affect our resolution of that question. We express no opinion about the effect of any prospective decisions by the Corps of Engineers or future acts of the MOA with respect to this property. As to the narrow question before us here, we simply hold that the past acts of the MOA with respect to the twenty-foot-wide band have not resulted in a compensable taking.

### f. *Other issues*

The landowners raise several other issues. They assert that we should follow a rule of joint and several liability where several governments regulate land use, causing loss. They also assert that it was error to permit the MOA to amend its defenses at trial to assert that these wetlands were subject to joint governmental action. Because the landowners now limit their claim to "the last twenty feet of setback," these issues are moot.

## IV. *MOA'S CROSS–APPEAL*

### A. *Standard of Review*

We review the interpretation of Alaska Civil Rules governing the award of costs and attorney's fees de novo, and will adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[49]

### B. *The MOA's Requests for Attorney's Fees and Costs*

 After the court granted complete summary judgment to the MOA, the MOA

**46.** *See* 447 U.S. at 262, 100 S.Ct. 2138.

**47.** 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001).

**48.** 533 U.S. ——, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). The Court there remanded for con-

sideration of the owner's takings claim under the *Penn Central* analysis.

**49.** *See Bobich v. Hughes,* 965 P.2d 1196, 1197 (Alaska 1998) (interpreting Alaska Civil Rule 68); *D.L.M. v. M.W.,* 941 P.2d 900, 902 (Alaska 1997) (interpreting Alaska Civil Rules 79 and 82).

requested an award of costs under Alaska Civil Rule 79 and an award of attorney's fees under Civil Rule 82.[50] Reasoning that Alaska Civil Rule 72 governed inverse condemnation proceedings, the trial court denied both applications.

The MOA argues that Rule 72 supersedes Rules 79 and 82 only when the condemnor initiates condemnation actions, but does not prohibit the MOA from recovering costs and attorney's fees when a landowner asserts an unsuccessful inverse condemnation claim.

Rules 79 and 82, respectively, provide that costs and attorney's fees shall be awarded to the prevailing party in a civil case, except as otherwise provided by law. Rule 72 creates a narrow exception in those cases involving "the condemnation of property under the power of eminent domain...."[51] It permits an award of attorney's fees to landowners who are named as defendants in eminent domain actions initiated by the government, based upon the constitutional requirement of just compensation, where a taking of private property has occurred.[52] We have not applied Rule 72 in an action initiated by a landowner in which it is determined that there has been no inverse condemnation or taking.

 Cases cited by the MOA demonstrate that this court has been willing to award attorney's fees when no taking has been found. In *Stewart v. State, Department*

*of Transportation & Public Facilities*, we explained: "[t]he mere fact that a party brings an inverse condemnation action does not mean that there has been a taking. If a court dismissed an inverse condemnation complaint because there was no taking, the purported condemnor would be entitled to attorney's fees."[53]

We followed a similar approach in *Weidner v. State, Department of Transportation & Public Facilities*, where the trial court found no taking and awarded the state its costs and attorney's fees.[54] We affirmed in all respects, although the landowner there did not argue on appeal that Rule 72(k) controlled.

We conclude that because the landowners asserted an unsuccessful inverse condemnation claim, Rule 72 does not supersede Rules 79 and 82 and that those rules permit the MOA to recover costs and attorney's fees here. As the prevailing party, the MOA is entitled to recover partial fees under Rule 82 and costs under Rule 79.

## V. CONCLUSION

We AFFIRM the judgment because we hold that the MOA's actions did not effect a compensable taking, but we REVERSE the denial of the MOA's request for costs and motion for attorney's fees and REMAND for further proceedings in accord with this opinion.

**50.** Alaska Civil Rule 79(a) provides:
*Allowance to Prevailing Party.* Unless the court otherwise directs, the prevailing party is entitled to recover costs allowable under paragraph (f) that were necessarily incurred in the action.
Alaska Civil Rule 82(a) provides:
*Allowance to Prevailing Party.* Except as otherwise provided by law ... the prevailing party in a civil case shall be awarded attorney's fees calculated under this rule.

**51.** Alaska R. Civ. P. 72(a).

**52.** Alaska Rule of Civil Procedure 72(k) provides: "Costs and attorney's fees incurred by a defendant must be assessed against the plaintiff if: (1) the taking of the property is denied...."

**53.** 693 P.2d 827, 831 n. 3 (Alaska 1984).

**54.** 860 P.2d 1205, 1212–13 (Alaska 1993); *see also Locklin v. City of Lafayette*, 7 Cal.4th 327, 27 Cal.Rptr.2d 613, 867 P.2d 724, 754–56 (1994). There the California Supreme Court analyzed the issue under similar constitutional, cost, and attorney's fees provisions and held:

An inverse condemnation plaintiff must establish a compensable taking or damage before article I, section 19 of the California Constitution, may be invoked to shield the unsuccessful plaintiff from assessment of costs.... Neither sound public policy nor protection of property owner's rights under article I, section 19 of the California Constitution, suggests that public funding of inverse condemnation actions is necessary if the plaintiff fails to establish a compensable taking or damage.

*Locklin*, 27 Cal.Rptr.2d 613, 867 P.2d at 756.