# United States Court of Appeals
## For the First Circuit

No. 09-1185

BOSTON AND MAINE CORPORATION,

Plaintiff, Appellant,

v.

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Howard, Circuit Judges.

Gene C. Schaerr with whom Eric L. Hirschhorn, Andrew C.
Nichols, Winston & Strawn LLP, and Robert B. Culliford were on
brief for the appellant.
John M. Stevens with whom Douglas M. McGarrah, Cicely O.
Parseghian, Foley Hoag LLP, and Thomas F. Scott Darling III were on
brief for the appellee.

November 24, 2009

LYNCH, **Chief Judge**.  On June 30, 1983, the Boston and Maine Corporation ("B&M"), a railroad operator, was discharged from bankruptcy by a Consummation Order stating that it was "free and clear of all claims."  The Order was pursuant to § 77 of the Bankruptcy Act of 1898, 11 U.S.C. § 205 (repealed 1978).  B&M was the operator of what is now known as the MBTA Commuter Rail Maintenance Facility ("the Terminal"), a thirty-four-acre railroad terminal in the greater Boston area used for refueling diesel trains.  In 1983, the Terminal was owned by the Massachusetts Bay Transportation Authority ("the MBTA"), having been purchased by the MBTA from B&M in 1976; B&M had operated the Terminal under bankruptcy protection from 1970 to June 1983 and had owned the Terminal since the late 1920s.  B&M continued to operate the Terminal under an agreement with and for the benefit of the MBTA until December 31, 1986.

The MBTA asserted no claims against B&M regarding environmental matters before B&M's June 1983 discharge from bankruptcy, pursuant to the Consummation Order.  The MBTA did, however, assert a claim on May 4, 2004, almost 21 years later, against B&M.  The claim was for 95 percent of $15,340,810 for past costs and 95 percent of all future costs, as contribution, under state environmental law, the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, Mass. Gen. Laws ch. 21E ("Chapter 21E"), for certain cleanup activities the MBTA had

undertaken at the Terminal. The state's Department of Environmental Quality Engineering ("DEQE"), now known as the Department of Environmental Protection ("DEP"), had ordered the MBTA in 1989 to clean up oil contamination at the site under Chapter 21E. The MBTA sought contribution for that portion of cleanup it said was attributable to B&M for releases of oil and hazardous substances during B&M's operation and earlier ownership of the Terminal. The vast majority of these releases occurred prior to the 1983 Consummation Order.

In August 2005, B&M filed suit in federal district court, based on the Consummation Order, seeking to enjoin the MBTA from making its Chapter 21E contribution claims. It sought partial summary judgment on the ground that those claims had been discharged in 1983 and thus were barred by the operation of federal law, specifically § 77 of the Bankruptcy Act of 1898, 11 U.S.C. § 205 (repealed 1978). B&M also sought enforcement of the 1983 Consummation Order. B&M argues that the MBTA's claims are properly barred because, before June 30, 1983, the MBTA was well aware of oil contamination on the Terminal grounds; that the oil contamination, even then, violated environmental laws; that state and federal regulatory officials had required response actions to at least those releases that contaminated adjoining waters; and that Chapter 21E was enacted before the June 1983 bar date of the Consummation Order. It further asserts that the MBTA had

maintained a presence at the Terminal before 1983 and had even funded some of B&M's efforts to stop contamination.

The MBTA argues that it should be excepted from the discharge in the Consummation Order primarily because Chapter 21E was enacted and became effective on March 24, 1983, only a short time before B&M was discharged from bankruptcy; that as of the June 1983 discharge the Commonwealth had not forced the MBTA to clean up the site and that the MBTA could not then have anticipated that the Commonwealth would force it to clean up the site or that the MBTA would need to seek contribution for its cleanup efforts; and that it would be inequitable for the MBTA to bear the full cost of the cleanup because B&M caused the contamination as both the operator and prior owner of the site.

We hold that the MBTA's contribution claims under Chapter 21E for contamination prior to the 1983 discharge from bankruptcy are barred as a matter of law by the Consummation Order.  We reverse and direct entry of judgment on these claims for B&M.

I.

We take the facts largely as described by the district court and from the record of the district court proceedings.  There are not material disputes of fact; only disputes as to the legal consequences of those facts.

The MBTA is a body politic as well as a corporate and political subdivision of the Commonwealth of Massachusetts.  Mass.

-4-

Gen. Laws ch. 161A, § 2. It provides mass transportation services throughout eastern Massachusetts by means of bus, subway, and light rail. It is the second largest property owner in Massachusetts.

B&M is a common carrier providing railroad freight services in the northeastern United States. It owned the Terminal from the late 1920s, when the engine house and power house were built, to 1976, when the MBTA purchased the property. B&M continued to operate the Terminal until December 31, 1986, under agreements between the MBTA and B&M's bankruptcy trustees. Under the final operating agreement, B&M operated the MBTA commuter railroad as an independent contractor for the benefit of the MBTA from January 1, 1982, to December 31, 1986.

In the 1700s, the property where the Terminal is now located mainly consisted of tidal marshland drained by the Millers River. Railroad operations on the property began in the late 1800s. Around 1928, B&M secured licenses to fill a portion of Boston Harbor; these licenses included the obligation to collect and transport to the river the drainage interrupted by the fill operations. As filling operations progressed, B&M constructed various yards and railroad facilities on the filled land. In the 1940s, B&M began transitioning from steam to diesel locomotives and built a storeroom and diesel house to maintain the diesel locomotives. A one million gallon diesel fuel tank and a one

hundred thousand gallon diesel fuel tank were installed in 1949 and 1952, respectively.

As diesel locomotive use increased, contamination from oil and diesel leaks became increasingly common on the site. Sources of the leaks included oil dripping from trains during maintenance, leaks from above-ground tanks and pipes, and overflowing fuel during the refueling of the locomotives. Until 1984, the fuel hoses at the facility did not have automatic shutoff valves, and the only way technicians knew the locomotive fuel tanks were full was when they overflowed. The spills onto the ground became so extensive that the oil and fuel flowed into the drainage network and from there reached the nearby Millers River. Before the installation of a system in the early 1960s designed to prevent the fuel from reaching the river, the Millers River at times caught fire in the summer.

B&M acquired the rights to fill in the remaining portion of the Millers River in the early 1960s. B&M then installed a culvert along the length of the river in order to pick up drainage from the Terminal grounds and prevent it from reaching the open river. The culvert carried this oil to an oil separator near the Prison Point Bridge. This separated the oil caught from the culvert from the water. The water then continued to "the Miller[s] River and then out to the Charles."

-6-

Because a small amount of oil continued to leak out to the river, especially during storms, a system of absorbent booms was installed at the lower portion of the Millers River, apparently by the early 1960s. According to a 1986 report authored by longtime B&M employee Lawrence B. Boyd, both the Coast Guard and DEQE agreed that doing this was "irregular and probably illegal." Boyd noted in 1986 that "until the MBTA is willing to spend sufficient money to install a system capable of handling the storm flows encountered, [the boom system] does reduce the spill incidents."

In 1970, B&M filed for bankruptcy protection under the Bankruptcy Act of 1898. We describe the Act and its purposes later.

In December 1976, the MBTA purchased the Terminal from B&M out of bankruptcy. The Purchase and Sale Agreement provided the MBTA a right of entry on the property to inspect it, and both parties agreed to "bear the cost of, and be responsible for, any environmental impact study required of it by any governmental agency." The MBTA entered into two consecutive agreements with B&M's bankruptcy trustees, providing for B&M's continued operation of the Terminal. The first ran from the conveyance of ownership over the Terminal in 1976 until December 31, 1981, and the second agreement was in effect from January 1, 1982, until December 31, 1986. The two agreements contained similar terms, depicting B&M as

an independent contractor with full authority over the conduct of its employees.  The 1982 operating agreement included provisions indemnifying B&M against property damage.  The agreement also listed among its reporting requirements that B&M notify the MBTA of any "oil spill or pollution problem" within thirty minutes of B&M's general manager learning of it.

After the December 1976 purchase by the MBTA and before the June 30, 1983, discharge, a number of oil spills took place at the Terminal.  These spills received attention from both federal and state regulators.  On March 4, 1977, the Coast Guard cited B&M and the Metropolitan District Commission ("MDC") for an oil spill into the Millers River.  The MDC had an ongoing construction project at the Terminal at that time.  In response to the spill, daily monitoring of an oil interceptor chamber took place, with pumping of excess oil from the chamber into a 15,000 gallon storage tank on the property as needed.

Prompted by the Coast Guard's warnings and fines, B&M approached the MBTA about upgrading the oil separation system.  In 1978, the MBTA agreed to upgrade the oil trap by installing additional pumps and an above-ground oil separator.  The MBTA provided funding to build the additional separator, paying approximately $70,000.  In return, the MBTA received "the recovered petroleum products to burn in the [Terminal's] boilers."  The

recovered petroleum products initially, in 1978, amounted to approximately 35,000 gallons per year.

In spite of these improvements, a second spill occurred shortly thereafter. On July 19, 1979, the Coast Guard responded to an oil spill from the Terminal grounds into the Millers River. A Coast Guard official visited a B&M office, advised a B&M official of the severity of the spill, and then went to the site to take samples from the oil interceptor chamber and the river. Shortly thereafter, J. L. Ford, a B&M supervisor, arrived and "took control of the problem." Ford advised the Coast Guard official that B&M would add new booms and pump out the oil in the chamber. Ford met with another Coast Guard official at the Terminal a few days later to discuss the problem and report what action had been taken.

Also in July 1979, as Ford noted, pit 42 at the Terminal was filled "up to the track level with oil and water." He described "a one inch coat of heavy thick oil"--the equivalent of two hundred gallons of oil--and explained that the pit was "constantly filling" up with oil, necessitating pumping every week and a half to two weeks. He also observed that "[t]he entire ground area" was "saturated with oil from engines." He suggested that if this pit filling with oil was going to be a regular problem, B&M should consider adding a holding tank there, rather than letting the oil and fuel flow to the oil chamber.

-9-

On December 14, 1980, another spill took place at the Budd House, an area used to fuel and lubricate diesel locomotives. The spill flowed into the floor drains and then to the Yard 14 oil pit. B&M contractors pumped approximately 14,000 to 15,000 gallons of oil from the pit. Most of the oil was held in the oil separator and did not reach the river. When Boyd found out about the spill on December 14, he telephoned the National Spill Response Center and contacted the Coast Guard. He also accepted responsibility for the spill on behalf of B&M. While at the Terminal that day, Boyd spoke with two Coast Guard officials, one of whom advised Boyd that the Coast Guard "would not be involved until there was an actual spill," meaning until the oil release reached the water. The Coast Guard collected samples and, a few days after the spill, Boyd sent the Coast Guard's Marine Safety Office a copy of an internal memorandum describing the spill and the cleanup efforts.

The Massachusetts Division of Water Pollution Control Eastern Regional Office, a division of DEQE, also had records of the December 14, 1980, spill, which noted that regulatory action was required.

Oil spills were reported to the DEQE Northeast Regional Office, which kept logs of spills at the Terminal site. Those logs reflect a number of additional spills during the MBTA's ownership of the Terminal and before the 1983 bar date. One logged oil spill from the Terminal property that entered the Millers and Charles

Rivers took place around July 22, 1981. The same logs contain another incident report of an oil spill on October 11, 1981, involving 1100 gallons of number 2 fuel oil on the Terminal grounds in the area of "Yard 5." A few days later, on October 19, 1981, a twenty gallon spill occurred on the grounds that entered the Millers River. It occurred in the area of "Yard 5" and possibly resulted from an overflow of the oil separator due to heavy rains the previous night. Boyd reported the spill to the state Division of Water Pollution Control, Eastern Regional Office.

On December 16, 1981, 100 gallons of number 2 fuel oil spilled from the Terminal into the Millers River. The DEQE Northeast Regional Office logs identify B&M as the responsible party.

As noted in the DEQE logs, a twenty gallon spill at Mystic Junction happened at the Terminal on March 8, 1982. In all of these cases, B&M retained a contractor to remediate the spills and the relevant DEQE log then listed the matter as closed.

Although it is not clear from the record whether the MBTA was involved in each of these specific spills, it is clear that its personnel were aware that spills were occurring and of the contamination that resulted. Starting in 1979, the MBTA placed an employee, Richard H. House, an MBTA mechanical officer, at the Terminal "nearly full time." The MBTA also had an office at the Terminal. The MBTA had a number of other employees on the premises

-11-

from 1979 to 1983. During that time, Walter Mark, House's supervisor, had a desk at the MBTA's office at the Terminal and was at the property "a few days a week"--and "in some cases . . . quite a bit." In 1980, Peter Wilson of the MBTA began working at the Terminal anywhere from one to five days per week. Walter Williams, Chief Mechanical Officer of the MBTA, worked at various times at the Terminal between 1979 and 1983.

During the 1979 to 1983 time period, both House and Wilson knew about the presence of oil on the ground at the Terminal. Wilson's shoes often became soiled from walking on the tracks or elsewhere at the Terminal. House described certain areas of the ground as "pretty saturated with oil, fuel oil." Wilson admitted "seeing oil-saturated puddles" on the ground at various fueling areas.

At times fuel was on the ground right in front of B&M's main offices at the Terminal. Wilson admitted that there was "a constant smell" of diesel fuel in "a lot of areas" from 1979 to 1983. In fact, oil spillage in certain areas was "constant and often excessive," according to Boyd's 1986 report. The 1986 report, which includes the period before 1983, identifies the affected areas as the fueling stands, the filling points for the storage tanks, the shop service areas, the ready tracks, "where locomotive and self propelled cars were stored awaiting dispatching

to service," and the tanks themselves, "both of which were found to have leaking floors."

House and Mark, the MBTA employees, also knew about oil spills occurring at the Terminal. House testified "there probably [were] some" spills and fuel releases that he witnessed at the Terminal. He recalled one instance in which a fuel hose broke at a building on the site and it "filled up with fuel oil three or four inches deep." House also recalled an occasion on which someone neglected to remove the nozzle from a locomotive, and the locomotive ripped the hose when it drove off, resulting in a spill. He also testified that personnel would sometimes forget to shut off fueling valves and would later discover that the fuel was overflowing.

When spills occurred, House, the MBTA's mechanical officer, discussed them with his supervisor, Mark, generally discussing the extent of the spill and what was being done to clean it up. Mark estimated hearing about "possibly as many as five" oil spills from pipes or tanks between 1979 and 1983.

The MBTA's knowledge of the spill went beyond its three employees at the site. Wilson testified to hearing about oil spills during this period from his "superiors at the [MBTA]." At one point between 1979 and 1983, MBTA employees told him about a spill of lubricating oil at the Terminal. Wilson further testified that on another occasion he received a call from William MacDonald,

the MBTA's Chief Engineer, informing him of an oil spill and asking him to check the booms on the river. He reported back to MacDonald that he had seen a "small oil sheen."

Beyond that, Wilson also testified that the MBTA had oversight of expenses at the Terminal, which would have included those associated with fuel spills.

MBTA employees also participated in discussions to address problems related to the oil spills. As mentioned, in 1978, the MBTA provided funding to upgrade the oil trap at the facility in return for the right to burn the spilled fuel captured in the trap.

In 1980, B&M officials also met with one or two MBTA officials to discuss the need to clean up an area of contamination in and around the coach house, an engine house area used to service and repair diesel engines, in order to procure a building permit. In 1982 or 1983, before undertaking construction at the coach house, Wilson and Dan Breen, a member of the MBTA's engineering staff, discussed the need to clean up and remove contaminated soil. Roger Bergeron of B&M noted that like in any engine house, there was an "accumulation of heavy greases." The soil was removed prior to the 1984 construction; the removed soil was contaminated with fuel oil and lubricants.

Leaks from the one million gallon fuel tank, installed on the property in 1949, were also discussed by B&M and the MBTA.

Some time between 1981 and 1982, Mark and House participated in meetings to discuss repairing leaks from the bottom of that tank. Among the reasons for repairs to the tank was concern about further regulatory involvement by the Coast Guard.

The MBTA and B&M also had discussions about how to reduce the amount of spills during refueling; as a result, the number of fueling locations was reduced, and, in 1984, automatic shutoff valves were installed on the fueling hoses.

In sum, officials at the MBTA were not only aware of significant releases of fuel prior to June 1983; they were also involved in and were aware of efforts to reduce and remediate the spills.

Before June 1983, the MBTA was also involved with environmental regulators at other MBTA sites. Specifically, in 1979, state environmental officials from the DEQE investigated the presence of 184 drums filled with hazardous material on property owned by the MBTA in Woburn, Massachusetts. Wilson also recalled hearing about spills or releases of oil at MBTA facilities other than the Terminal.

On March 24, 1983, three months before B&M's discharge from bankruptcy, Chapter 21E became law. Chapter 21E had been featured in the media for nearly a year before its enactment and was described as Massachusetts's equivalent to the federal Comprehensive Environmental Response, Compensation, and Liability

Act ("CERCLA"), which had been passed in 1980. 42 U.S.C. §§ 9601-9675.

Chapter 21E makes any "owner or operator of . . . a site from or at which there is or has been a release or threat of release of oil or hazardous material" jointly and severally liable for cleanup costs. Mass. Gen. Laws ch. 21E, § 5(a). Like many environmental cleanup laws, see, e.g., 42 U.S.C. § 9607, Chapter 21E enables the Massachusetts environmental regulatory agency, at that time DEQE, to hold one party responsible for remediating environmental damage and also creates a cause of action for that party to recover costs from other responsible parties. Mass. Gen. Laws ch. 21E, § 4 (amended 1992). As enacted in 1983, Chapter 21E further provided that private parties could remediate contamination themselves before the state took regulatory action. Id.

The Consummation Order from B&M's bankruptcy proceedings issued on June 17, 1983, and set a discharge date of June 30, 1983. Under the terms of the Consummation Order, B&M's property and assets, as of the discharge date, were transferred or vested in the reorganized B&M under its present owner, Guilford Transportation Industries, Inc., now known as Pan Am Railways, Inc. The transfer to the reorganized B&M was "free and clear of all claims," whether or not approved or acknowledged in the bankruptcy proceedings. The Consummation Order also enjoined and "permanently restrained" the

-16-

prosecution of any suits against the reorganized B&M that existed on or before the June 30, 1983, discharge date.

The MBTA did not file a proof of claim in the bankruptcy proceeding regarding liability under chapter 21E for soil contamination at the site before June 30, 1983.

After being discharged from bankruptcy, B&M continued to conduct operations at the Terminal until December 31, 1986. On January 1, 1987, Amtrak took over operations under a contract with the MBTA.

We discuss later events to explain how the current litigation arose. On November 18, 1988, a spill of diesel fuel occurred at the Terminal in the area of Yard 5. Amtrak personnel estimated 47,000 gallons spilled. DEQE personnel verbally notified Amtrak of its responsibility for the release the same day and by letter, dated April 10, 1989, and issued a Chapter 21E notice of responsibility and request for information. In a letter, dated July 31, 1989, the DEQE advised Amtrak that no further emergency response actions were required, but it noted remaining concerns requiring preparation of a preliminary assessment and a limited site investigation of the Terminal. An extended cleanup process followed, which culminated, in October 2002, with the MBTA filing reports with the DEP.

On May 4, 2004, an attorney representing the MBTA sent a demand letter under § 4A of Chapter 21E to B&M's corporate counsel.

The letter asserted B&M was liable under Chapter 21E to the MBTA for past and future costs incurred by the MBTA in responding to the release of oil and hazardous materials at the Terminal. The letter claimed that because B&M was responsible for 95 percent of the contamination at the Terminal, it was liable to MBTA for approximately $15 million in past costs and 95 percent of any future costs that MBTA might incur in monitoring and remediating contamination at the site.

## II.

In August 2005, B&M filed suit in the federal district court of Massachusetts, seeking declaratory judgment and injunctive relief and asserting that, under the terms of the June 30, 1983, Consummation Order, the present owners had acquired B&M free and clear of claims and that this barred the MBTA's action to recover cleanup costs. The MBTA counterclaimed to recover its costs under Chapter 21E. The parties agreed to bifurcate the case, with accelerated discovery and a decision to be made first on whether MBTA's claim was barred by B&M's discharge from bankruptcy, and a second phase of litigation to follow as needed. We address here only questions associated with the discharge from bankruptcy.

The case was referred to a magistrate judge. In a January 26, 2007, report and recommendation, the magistrate judge concluded that, because MBTA's Chapter 21E claim was not "fairly contemplated" at the time of the 1983 Order, the claim was not

-18-

discharged and thus the MBTA's suit for contribution could go forward.  Boston & Me. Corp. v. Mass. Bay Transp. Auth., Civ. 05-11656 (D. Mass. Feb. 16, 2007) (report and recommendation).  On November 4, 2008, a district judge simply adopted these recommendations, and on January 15, 2009, the district court granted B&M's motion to dismiss both parties' remaining state law claims so that they could be litigated in state court.

III.

We review a district court's grant of summary judgment de novo, Pineda v. Toomey, 533 F.3d 50, 53 (1st Cir. 2008), and consider the facts in the light most favorable to the nonmoving party, Fiacco v. Sigma Alpha Epsilon Fraternity, 528 F.3d 94, 97 (1st Cir. 2008).  A district court may grant summary judgment when it determines that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Further, we review de novo issues of statutory interpretation, such as the meaning of § 77 of the Bankruptcy Act of 1898.  See United States v. Tobin, 552 F.3d 29, 32 (1st Cir. 2009).

We conclude that the MBTA's Chapter 21E contribution claims, as to pre-June 30, 1983, activities, are barred by B&M's 1983 Consummation Order, because they are "claims" within the meaning of § 77.  In reaching this conclusion, we review the broad scope of actual and contingent claims that are subject to discharge

-19-

under § 77. We then find that because the MBTA had a contingent claim for contribution to pay for cleanup costs and knowledge of the facts and at least constructive notice of the law giving rise to the claim at the time of the Consummation Order, its contribution claims for pre-June 30, 1983, conduct by B&M have been discharged.

Because B&M filed for bankruptcy in 1970, prior to the 1978 enactment of the Bankruptcy Code, the terms of the bankruptcy and Consummation Order are governed by the Bankruptcy Act of 1898. In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co. (Chicago I), 974 F.2d 775, 780 (7th Cir. 1992). The controlling statutory language is set forth in § 77 of the 1898 Act, 11 U.S.C. § 205 (repealed 1978).[1] Section 77 was added to the Act in 1933. It provided much

---

[1] An important question, not raised by the parties, is whether the precedent the parties have cited, which primarily involves judicial efforts to resolve the competing policies of federal bankruptcy law and other federal statutes, applies here, where the issue involves one state statute and one federal statute. One rule of statutory construction applies when courts are construing two federal statutes and courts are attempting to effectuate the purposes of both. Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot., 474 U.S. 494, 505-06 (1986); In re Hemingway Transp., Inc., 993 F.2d 915, 924-25 (1st Cir. 1993). "The choice between two federal statutes requires an analysis of both, to see if they are indeed incompatible or if they can be harmonized, and if they are incompatible to decide which one Congress meant to take precedence." Coker v. Trans World Airlines, Inc., 165 F.3d 579, 583-84 (7th Cir. 1999). For example, when trying to effectuate the purposes of both § 77 of the 1898 Bankruptcy Act and of CERCLA, courts "attempt . . . to reconcile the conflicting goals of environmental cleanup and a 'fresh start' for bankruptcy debtors." In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co. (Chicago II), 3 F.3d 200, 201 (7th Cir. 1993).
That rule of construction is inapplicable when there are not

-20-

broader relief to bankrupt railroads, through discharging claims, than to bankrupt non-railroad parties covered by the other parts of the Act. This was pursuant to a specific policy Congress chose to encourage and protect reorganization of railroads. As the Supreme Court explained;

> [A railway's] activities can not be halted because its continuous, uninterrupted operation is necessary in the public interest; and, for the preservation of that interest, as well as for the protection of the various private interests involved, reorganization was evidently regarded as the most feasible solution whenever the corporation had become "insolvent or unable to meet its debts as they mature."

Cont'l Ill. Nat'l Bank & Trust Co. v. Chicago, R.I. Ry. Co., 294 U.S. 648, 671-72 (1935). While "[o]rdinary bankruptcy aims at liquidation of a business, [r]eorganization under § 77 aims at a continuation of the old business under a new capital structure that respects the relative priorities of the various claimants." Baker v. Gold Seal Liquors, Inc., 417 U.S. 467, 470 n.3 (1974). "The public interest, as well as the interests of creditors and stockholders, is at issue." Id. at 474.

---

two federal statutes at issue. Here, there is only one federal statute, the Bankruptcy Act, and the claim sought to be excused from the discharge arises under state law. But no party raised this point with the district court, and it has not been briefed. Rather, the parties have in their briefs assumed that the relevant caselaw is that of whether bankruptcy discharges bar federal environmental claims. We will assume, dubitante, that this is so.

In any event, we do engage in construction of the term "claim" as under the 1898 Bankruptcy Act itself. See Ohio v. Kovacs, 469 U.S. 274 (1985).

Based on this goal of ensuring that railroads continue to function, courts enforcing the provisions of § 77 have narrowly construed exceptions to the statute to ensure a fresh start for reorganized railroads. See Gardner v. New Jersey, 329 U.S. 565, 573 (1947); see also Chicago II, 3 F.3d at 201; In re Penn Cent. Transp. Co. (Penn Central II), 944 F.2d 164, 167-68 (3rd Cir. 1991). "[T]he purpose of the bankruptcy law and the provisions for reorganization could not be realized if the discharge of debtors were not complete and absolute." Duryee v. Erie R. Co., 175 F.2d 58, 63 (6th Cir. 1949).

The protection for railroads offered by § 77 is reflected in its provisions governing the discharge of claims, and B&M's Consummation Order was drafted in light of this language. Under the Consummation Order, B&M was discharged and released from "all obligations, debts, liabilities and claims . . . whether or not filed or presented, whether or not approved, acknowledge or allowed in these proceedings and whether or not provable in bankruptcy . . . ." Further, the Order issued an injunction against bringing such claims.

The Act itself provides that upon discharge the railroad shall be "free and clear of all claims of the debtor, its stockholders and creditors," except when consistent with the provisions of the reorganization plan and reserved in the order confirming the plan. 11 U.S.C. § 205(f) (repealed 1978). This

-22-

exception is inapplicable here.  The Act defines "creditors" as "all holders of claims of whatever character against the debtor or its property, whether or not such claims would otherwise constitute provable claims under this [Act]."  Id. § 205(b).  "Claims" under the Act are defined as "includ[ing] debts, whether liquidated or unliquidated, securities (other than stock and option warrants to subscribe to stock), liens, or other interests of whatever character."  Id.

The definition of a "claim" under § 77 deliberately did not invoke the provability requirement for claims under other parts of the Bankruptcy Act.  11 U.S.C. § 205(b), (f) (repealed 1978).  This reflects the "sweeping" and "all-inclusive" breadth of the kinds of claims discharged under § 77.  Gardner, 329 U.S. at 572-73; see also City of New York v. N.Y., N.H. & H.R. Co., 344 U.S. 293, 295 (1953).  "[I]f courts should relax the provisions of the law and facilitate the assertion of old claims against discharged and reorganized debtors, the policy of the law would be defeated . . . ."  Duryee, 175 F.2d at 63.

The term "claim" under § 77 encompasses both contract claims and tort claims,  as well as statutory obligations to the government.  See Chicago I, 974 F.2d at 781, 786; see also  N.Y., N.H. & H.R. Co., 344 U.S. at 300-01.  Claims for contribution to environmental cleanup costs, like the one asserted by the MBTA, clearly fall within the scope of what § 77 would discharge as a

-23-

"claim," and the MBTA, to its credit, does not argue otherwise.
See, e.g., Chicago II, 3 F.3d at 207.

Further, the definition of a "claim" in § 77 includes not only existing causes of action but also "contingent claims." See Schweitzer v. Consol. Rail Corp., 758 F.2d 936, 942 (3d Cir. 1985); Chicago I, 974 F.2d at 781. "This proposition follows from the broad language of section 77(b) which provides that 'claims' include 'interests of whatever character.'" Schweitzer, 758 F.2d at 942. A contingent claim is "[a] claim that has not yet accrued and is dependent on some future event that may never happen." Black's Law Dictionary 282 (9th ed. 2009).

This circuit has held, at least with respect to the current Bankruptcy Code, that a contingent claim for contribution to environmental cleanup costs may be discharged even if it is uncertain. In re Hemingway Transp., 993 F.2d at 923. This ensures that holders of contingent and indeterminate claims not "stand aloof and obtain . . . the equivalent of a preference for them over unsecured creditors with accrued or determinable claims." In re Radio-Keith-Orpheum Corp., 106 F.2d 22, 26 (2d Cir. 1939).

For a contingent claim to exist, the law giving rise to the claim or the same "type of liability" must have existed before the bar date, so as not to give rise to constitutional concerns. See Penn Central II, 944 F.2d at 167-68; cf. Chicago II, 3 F.3d at 208 (remanding to the district court to determine whether the "type

-24-

of liability" created by a statute passed after a railroad's discharge from bankruptcy existed under statutes pre-discharge, in order to determine the existence of a pre-bar date contingent claim); In re Chateaugay Corp., 944 F.2d 997, 1003 (2d Cir. 1991).

Since our case involves actual knowledge, there is no need to discuss cases presenting outlier facts where a potential claimant did not know of the contamination. Even so, actual knowledge by the creditor of the claim is not necessary; constructive knowledge suffices.[2] Chicago II, 3 F.3d at 207. Here, the MBTA had actual notice of the contamination and at least constructive notice of the law well before B&M's Consummation Order. Cf. AM Int'l, Inc. v. Datacard Corp., 106 F.3d 1342, 1348 (7th Cir. 1997) (affirming that CERCLA claims where not discharged when there had been no possible notice of contamination). A contingent claim to recover cleanup costs exists if sufficient information was available to the prospective claimants that, if sought out, would give the plaintiff constructive knowledge of the claim. Chicago II, 3 F.3d at 207. Section 77 does not allow

---

[2] In N.Y., N.H. & H.R. Co., 344 U.S. at 301, the Supreme Court declined to bar claims of a creditor who had not received actual notice from the court of the claims bar date. Section 77 itself requires that "reasonable notice" of the bankruptcy proceeding be provided to potential creditors. 11 U.S.C. § 205(c)(8) (repealed 1978). There is no claim by the MBTA that it did not have notice of the bankruptcy proceeding itself.

-25-

plaintiffs "to put on blinders or attempt an 'ostrich defense.'"[3] Id.

Given the broad scope of § 77, we conclude that, at the time of the 1983 discharge from bankruptcy, the MBTA clearly had both sufficient knowledge and a contingent claim that was subject to discharge by the Consummation Order.

In this case, there is no doubt, as the facts make clear, that the MBTA had actual knowledge of the oil contamination at the site, both surface and subsurface, in June 1983.  MBTA employees saw puddles of fuel oil sitting on the property and would have known that for the fuel to have reached the Millers River it had to flow across the property and into the river or the drainage system. As the Seventh Circuit noted in Chicago II, "[o]ne does not need an engineering degree to conclude that grease, oil and fuel left standing for a long period of time have the capacity to seep into the subsurface of soil."  3 F.3d at 207. The MBTA paid for and participated in decisions to remediate some of the effects of these spills.  It was aware that at least federal regulators were watching spills at the Terminal, and information was available that the state was keeping logs on the spills.  There is also no question here that the MBTA knew that B&M was tied to, and a source

_____

[3]     The Third Circuit has held a pre-discharge antitrust claim barred when the plaintiffs had no actual knowledge of the facts giving rise to the claim but had notice of the discharge date.  In re Penn Cent. Transp. Co., 771 F.2d 762, 769 (3d Cir. 1985).

of, the contamination. See Chicago I, 3 F.3d at 206. And there is no question that the MBTA had actual knowledge of releases of hazardous substances before June 30, 1983. The MBTA also knew the oil contamination was significant, and certainly was not de minimis.

Further, by contract, the MBTA had reason to be aware of the spills at the site. The original purchase agreement provided that the parties would split the costs of any environmental impact study. The MBTA had oversight of the expenses B&M incurred addressing the spills and leaks. Starting in 1982, B&M was required by contract to inform the MBTA of any "oil spill or pollution problem" at the Terminal. And there were contractual indemnification provisions. If nothing else, the legal and practical relationship between the two ensured the MBTA's knowledge of the contamination. In re Chateaugay Corp., 944 F.2d at 1005.

There is also no doubt that, at the time of the Consummation Order, both B&M and the MBTA were subject to enforcement action by DEQE under Chapter 21E. Mass. Gen. Laws ch. 21E, § 5(a) ("[T]he owner or operator of a . . . site from or at which there is or has been a release or threat of release of oil or hazardous material . . . shall be liable, without regard to fault . . . . [S]uch liability shall be joint and several.").

Here, the Chapter 21E claim arises under state law, and Supreme Judicial Court of Massachusetts ("SJC") precedent requires

a conclusion that the MBTA had at least a contingent claim before the discharge date.[4]  In Reynolds Bros., Inc. v. Texaco, Inc., the SJC held that when the owner of land knows of the contamination and of potential liability for cleanup costs, the owner has a claim under Chapter 21E, despite the fact that the right to payment from another for the cleanup costs may not technically have yet arisen. 647 N.E.2d 1205, 1208-09 (Mass. 1995).  The state high court held that such a claim under Chapter 21E was a "claim" under the Bankruptcy Code and was discharged when not listed before the bar date.  Id. at 1209.  Specifically, it held the owner of an oil storage facility who had knowledge of the potential liability of the debtor, a previous owner of the site who had used it as an oil storage facility, was barred.  Id.

The MBTA argues that it should be given an exception to the discharge because Chapter 21E was the first time soil contamination due to oil was regulated, and, at the time of 1983 discharge, it had no reason to know that as a property owner Chapter 21E would force it to incur costs to remediate contamination.  Even if this argument were not foreclosed by

---

[4]    When state law creates obligations on debtors in bankruptcy, courts must determine whether those obligations constitute "claims" within the meaning of federal law such that they are discharged.  See Davis v. Cox, 356 F.3d 76, 81-85 (1st Cir. 2004); In re 229 Main St. Ltd. P'ship, 262 F.3d 1, 3-4 (1st Cir. 2001).

-28-

Reynolds, it fails.[5]  Chapter 21E was enacted about three months before B&M was discharged from bankruptcy and claims were barred. Cf. In re Reading Co., 115 F.3d 1111, 1115, 1125 (3d Cir. 1997) (finding a CERCLA claim barred when the statute was enacted three weeks prior to the discharge date).  The new law, Chapter 21E, plainly told the MBTA that it was liable as a present owner in 1983 for all hazardous substance contamination, including the oil contamination, which the MBTA knew was present at the site.  In addition to Chapter 21E, the same "type of liability" also existed prior to 1983.  See Chicago II, 3 F.3d at 208.  The MBTA was potentially liable for cleanup costs even before the passage of 21E under the common law of nuisance.  Nassr v. Commonwealth, 477 N.E.2d 987, 993 (1985) (holding that under "well established" common law principles property owners could be liable, regardless of their own fault, for a public nuisance caused by lessors of the property that poured waste on the ground which posed risks of groundwater contamination and on-site ignition).

---

[5]    Additionally, CERCLA had been enacted in 1980, and it was not legally foreclosed that there was CERCLA exposure for the MBTA and contribution against B&M for at least waste oil contamination. In re Crystal Oil, 158 F.3d 291, 296 (5th Cir. 1998).  The MBTA points out that CERCLA specifically exempts petroleum, crude oil, and crude oil fractions from the definition of hazardous substances.  42 U.S.C. § 9601(14).  But it was far from clear that waste oil was not covered by CERCLA, and by April 1985 the EPA had concluded it was.  Notification Requirements; Reportable Quantity Adjustments, 50 Fed. Reg. 13,456 (Apr. 4, 1985).

Further, it is clear that under Chapter 21E, had the MBTA incurred cleanup costs prior to the discharge date either because it chose to remediate the contamination or because DEQE required it to do so, it would have had a claim for contribution against B&M. Mass. Gen. Laws ch. 21E, § 4 ("Any person who undertakes assessment, containment or removal action regarding the release or threat of release of oil or hazardous material shall be entitled to reimbursement from any other person liable for such release or threat of release for the reasonable costs of such assessment, containment and removal.") (amended 1992); see also Reynolds Bros., Inc., 647 N.E.2d at 1209 n.10; Atlas Tack Corp. v. Crosby, 671 N.E.2d 954, 956 n.5 (Mass. App. Ct. 1996) ("Under [Chapter 21E], regardless of any involvement by the DEP, there is a private right of action in favor of any person who undertakes the removal of oil or hazardous materials and who seeks recovery of response costs from the person liable for the contamination.").

Even before the passage of Chapter 21E, the MBTA would have had a contribution claim against B&M under nuisance law. Mass. Gen. Laws ch. 231B, § 1(a) ("[W]here two or more persons become jointly liable in tort for the same injury to person or property, there shall be a right of contribution among them even though judgment has not been recovered against any or all of them.").

Indeed, the MBTA does not argue that it did not have a contingent claim for contribution against B&M prior to June 30, 1983. The MBTA's argument is that the appropriate inquiry under § 77 turns, not on the existence of a contingent claim, but on whether it could have "fairly contemplated" the claim at the time. It contends that, according to case law, contribution claims between private parties cannot be discharged unless the parties expressly contemplated them before the bankruptcy, or involvement of regulatory agencies prior to the bar of claims gave the parties reason to have foreseen or contemplated the need to seek contribution to pay for cleanup activities.[6]

We see no basis in the text of the statute, 11 U.S.C. § 205 (repealed 1978), or in its legislative history for the adoption of a "fair contemplation" test under § 77. To the contrary, such a construction would be inconsistent with the text and history of the statute. Section 77 plainly defines "claims" to include "interests of whatever character," making no mention of

---

[6] The MBTA distinguishes its contribution claim from a direct claim by a regulatory agency like DEQE. The MBTA conceded at oral arguments that under § 77 any claims by the state against B&M under Chapter 21E would have been discharged in this case. It argues that whereas a regulatory agency need simply know of the contamination to foresee a claim, a private party must not only know of the contamination but also have reason to contemplate being compelled to take remedial action that would give rise to a contribution claim. We see no reason why a private party should be treated better than a state.

claims that can be fairly contemplated. Id. § 205(b). Further, none of the cases cited by the MBTA support such a conclusion.

This application of a fair contemplation test is also inconsistent with congressional purposes behind § 77. By allowing contingent claims that existed prior to the discharge from bankruptcy to be raised later, the fair contemplation test thwarts the goal of rehabilitating railroads. Baker, 417 U.S. at 470 n.3; Duryee, 175 F.2d at 63 ("[C]reditors would not participate in reorganizations if they could not feel that the plan was final[,] and . . . it would be unjust and unfair to those who had accepted and acted upon a reorganization plan if the court were thereafter to reopen the plan and change the conditions which constituted the basis of its earlier acceptance.").

To be sure, a statute must be interpreted to comply with constitutional due process concerns. But the "fair contemplation" test is far broader than any due process test and cannot be justified as grounded in constitutional concerns. Due process concerns might exist, for example, if the type of claim was newly created by statute and the statute did not come into existence until after the debtor was discharged from bankruptcy. Cf. Penn Central II, 944 F.2d at 167-68. Due process concerns might also exist if a party had no possible basis to know from the facts that a claim existed at the time of the discharge. An example would be a person being injured at some time in the future by the failure of

a bridge built by a construction company that had previously filed for bankruptcy, cf. In re Chateaugay Corp., 944 F.2d at 1003, or a victim of an airplane crash that happened years after the manufacturer was discharged from bankruptcy. But this case presents no possible due process concerns. This is not a situation in which the MBTA literally could not have known on either the law or the facts that it had a claim.

It is enough in this case that the MBTA had a contingent claim for contribution, knew of the facts giving rise to that claim, was potentially liable for the oil contamination at the Terminal under state law, and had notice of the date to assert the claim to avoid being barred by B&M's discharge from bankruptcy. In re Penn Cent. Transp. Co., 71 F.3d 1113, 1117 (3d Cir. 1995) (noting that a contingent claim for contribution existed after the passage of CERCLA made the party "potentially liable . . . for contribution and indemnity"); Chicago II, 3 F.3d at 207; see also In re Chateaugay Corp., 944 F.2d at 1005.

Public policy also weighs strongly against the MBTA's "fair contemplation" test. It would be against public policy to adopt a test that would require government agencies, such as DEQE, to have actually ordered remedial action before the owner of a contaminated site could be deemed to have knowledge of a potential cleanup action. Indeed, in many cases the owner will be more likely than regulators to have knowledge of contamination and so of

the need for a cleanup. Parties should not be rewarded for delaying their cleanup activities and delaying notice to potential contributors. See Chicago II, 3 F.3d at 207; In re Radio-Keith-Orpheum, 106 F.2d at 26-27.

Both sides have been ably represented by counsel; the facts and the law require rejection of the MBTA's arguments. The MBTA's contribution claims arising out of pre-June 30, 1983, conduct by B&M are barred by the Consummation Order, so B&M is entitled to an order enjoining the MBTA from pursuing claims for investigation or remediation costs for contamination at the Terminal occurring before June 30, 1983.[7]

For these reasons, we reverse the judgment of the district court and direct entry of judgment on these claims for B&M. No costs are ordered on appeal.

---

[7] To the extent B&M sought an order that the MBTA was in contempt of the injunctive relief portion of the Consummation Order, it has abandoned that claim.