[No. G041311. Fourth Dist., Div. Three. May 20, 2010.]

MICHAEL BOYAJIAN, Plaintiff and Appellant, v.
SHAHROKH ORDOUBADI, Defendant and Respondent.

## COUNSEL

Jonathan R. Ellowitz for Plaintiff and Appellant.

Thomas Breen Kidwell for Defendant and Respondent.

**OPINION**

**SILLS, P. J.**—Because bankruptcy law allows for discharges of contingent claims, including claims against the debtor for indemnity before the time the indemnity claim against the debtor can be precisely measured, we affirm the trial court's judgment precluding the assertion of a prepetition claim for equitable indemnity against the debtor, the respondent and successful defendant at trial, Shahrokh Ordoubadi. The trial court correctly determined that plaintiff's claim for equitable indemnity was discharged in a bankruptcy proceeding in 1994.

## I. THE HISTORY

Like many mystery stories, legal cases often trace their true origins to sins of the past whose effects are visited on the present. This case is a compilation of three separate wrong decisions, the net effect of which would mean that plaintiff Michael (sometimes "Mike") Boyajian would have no claim for indemnity against the individual, Shahrokh Ordoubadi, who would turn out to be his coconspirator in a scheme to defraud a Dutch law firm.[1]

### A. Wrong Decision One: Trying to Defraud the Hague Tribunal

#### 1. *Plan A: Letters of Credit*

In November 1979, an angry mob of young Islamic revolutionaries backed by the Iranian government overran the American Embassy in Tehran, taking more than 60 Americans hostage. President Carter ordered a freeze on all Iranian funds. Ordoubadi, then an Iranian citizen living in the United States, wanted to get money out of Iran. So did Ordoubadi's stepbrother, Karl Showrai. But claims against the frozen funds could only be made by American citizens, and neither was an American citizen at the time.

---

[1] Our narrative is taken mainly from the posttrial findings of fact and conclusions of law in *Loeff & Van Der Ploeg v. Boyajian*, Nos. CV96-5737LGB, CV97-3913LGB, and CV97-3914LGB in the Central District of California, as written by Judge Lourdes G. Baird, filed January 25, 1999, in the United States District Court for the Central District of California. There are a few more interesting details to be found in a prior published New York federal court decision in a bank interpleader case involving a skeletal version of the same basic facts, *Federal Reserve Bank of New York v. Williams* (S.D.N.Y. 1989) 708 F.Supp. 48 (*Williams*). We will note those details in the margin.

So Showrai, or Ordoubadi, or both, came up with this scheme: They invented Gordon Williams, and formed an Ohio irrigation equipment company called K & S Irrigation.[2] The irrigation company would sell equipment at inflated prices to Showrai's contracting company back in Iran known as Keyhan Corporation. The basic idea was to get money out of Iran. Showrai authorized Ordoubadi to take funds from Keyhan and deposit it in Iranian banks to obtain two letters of credit, each for $167,521.

But the scheme didn't work: Banks in the United States refused to honor the letters of credit in the wake of the freeze on all Iranian assets.

### 2. *Plan B: A Formal Claim to the Hague*

Ordoubadi went to plan B, which was essentially to make a claim to the Hague Tribunal based on the two dishonored letters of credit in the name of the nonexistent Gordon Williams. The tribunal had been set up by the Algiers Accords to adjudicate disputes between United States nationals and the government of Iran. The major obstacle to the scheme was that, not being an American citizen at the time, he had no standing in his own right to present a claim to the tribunal.

The fictitious Gordon Williams was, at least as he existed on paper, an American citizen. In 1982, a driver's license and an American birth certificate were dummied up for Williams, plus other documents, in what would later become "Claim 187" presented to the Hague Tribunal.

A front man, however, was needed. And that's where Mike Boyajian came in. Boyajian agreed to present the documents to a Dutch law firm known as Loeff & Van Der Ploeg, along with a $2,000 initial payment. The idea was that the Loeff firm would present Claim 187 to the Hague Tribunal.

Boyajian presented the documents in September 1982, when, ostensibly traveling on vacation, he met Leonard H.W. van Sandick of the Loeff firm. Sandick was pleased that Gordon Williams had a United States birth certificate. While Sandick had some early doubts about the Williams claim, reassurances from Boyajian caused him to believe in its bona fides.

The Loeff firm took the case, and, to skip ahead to 1987, obtained an award in favor of Gordon Williams for exactly $167,521.[3]

---

[2] There is an indication in *Williams*, reiterating the results of a United States Treasury Department investigation, that once upon a time there really was a Gordon Williams, but he died in 1982. (See *Williams, supra*, 708 F.Supp. at p. 51.)

[3] The Showrai-Ordoubadi relationship has all the elements of one of those heist movies where the thieves soon start turning on each other to grab more than their fair share of the loot.

But again, the scheme didn't work. In 1988, Sandick discovered that Gordon Williams didn't exist. Sandick called *his* contact, Boyajian, and Boyajian confessed that Williams was, in fact, Ordoubadi.

The jig was up. Sandick informed the tribunal of the falsity of the claim. The money, instead of going to Ordoubadi, ended up in the Federal Reserve Bank of New York, where, in litigation in the Southern District of New York, the federal court would determine that Showrai, posing as Williams, was not entitled to the money. (See *Williams, supra*, 708 F.Supp. 48.) Ordoubadi, also posing as Williams, was not a claimant in that litigation.[4] The money ultimately ended up in the N.V. Settlement Bank of the Netherlands.

### B. Wrong Decision Two: Stiffing the Dutch Law Firm

But this case is not about, at least directly, the Ordoubadi-Showrai-Boyajian scheme to obtain money under false pretenses. Another part of the scheme was this: Other than the initial payment of $2,000, Ordoubadi and Boyajian never intended to pay the Loeff firm any of its fees.[5]

The Loeff firm was not happy about being duped, and even unhappier at having done about $95,000 of work on the Williams case and then not getting paid for it. Accordingly, in 1990, the Loeff firm sued Boyajian, Ordoubadi and Showrai in Northern California (where Ordoubadi apparently lived). That litigation (after transfer to Southern Cal.) would eventually, in 1999, yield a judgment against Showrai, Ordoubadi and Boyajian in a decision by Judge Lourdes G. Baird.

---

(E.g., A Fish Called Wanda (MGM 1988).) The *Williams* decision notes that, in 1982, Ordoubadi told Showrai that *Ordoubadi* had filed a claim with the tribunal, but that "the claim had been dismissed because Ordoubadi lacked the funds to hire a lawyer." (*Williams, supra*, 708 F.Supp. at p. 51.) The *Williams* decision then noted that "Showrai received no further word from the Tribunal until December, 1987 . . . ." (*Id.* at pp. 51–52.) Only after learning the funds had been paid did Showrai make a direct claim on the fund in the name of Williams, a claim that led to the *Williams* decision. (*Id.* at pp. 50–51.)

[4] More tangled webs: Obviously both Showrai and Ordoubadi had used Williams as an alias. The *Williams* decision first recounts that Showrai "used the alias 'Gordon Williams,' a name derived from the first names of two of his American friends." (*Williams, supra*, 708 F.Supp. at p. 51.) The *Williams* case later notes, however, that Ordoubadi submitted an affidavit in the case claiming that Showrai introduced *Ordoubadi* "to an individual named Gordon Williams, who was the owner of a K & S Irrigation Company." (*Id.* at p. 52.) Yet Judge Baird found that Boyajian knew that *Ordoubadi* was Williams all along: "Sandick telephoned Boyajian to determine whether his client, Williams, was in truth Ordoubadi. Boyajian confirmed that the client Sandick had been representing was Ordoubadi and that no person by the name of Gordon Williams existed." Readers can draw their own conclusions about the credibility of the characters in this drama.

[5] Was Showrai in on the scheme to defraud the Loeff firm? Judging by the statement from *Williams*, quoted in footnote 3 above, that Showrai "received no further word from the Tribunal until December, 1987," it would appear that in contacting the Loeff firm, Ordoubadi was essentially going into business for himself. But he still needed Boyajian to pull the caper off.

Significantly, both Boyajian and Ordoubadi answered the Loeff suit against them and would eventually file cross-claims against each other for indemnity.

Here is what Michael Boyajian said in his cross-claim,[6] albeit filed in 1997, about his potential liability to the Loeff firm: "To the extent that Defendant Boyajian acted in connection with the transaction which is the subject of the Complaint [(i.e., Loeff not being paid its fees)] herein, he acted at all times at the request and direction of Defendant Ordoubadi, also known as Gordon Williams. If Defendant Boyajian is held liable to Plaintiff [the Loeff firm] for any claims asserted by Plaintiff, then the Cross-Defendants [Ordoubadi and Showrai] are liable to Defendant Boyajian for all claims asserted by Plaintiff against Boyajian."

But that's getting a bit ahead of ourselves in the narrative. In 1993, with the Loeff claim pending, Ordoubadi filed for chapter 7 bankruptcy, listing a purported claim by Boyajian related to the Loeff action. The Loeff firm filed an adversary action in this bankruptcy to establish that its claim against Ordoubadi was not dischargeable. Ordoubadi received, in 1994, a discharge in what was supposed to be a no-asset case; the discharge, however, did not extend to the Loeff claim.

For his part, in 1995, Boyajian filed for chapter 11 bankruptcy in the Central District of California. The Loeff firm also filed an adversary action there, to establish the nondischargeability of its claim against Boyajian.

### C. Wrong Decision Three: Not Litigating the Claim for Indemnity When Boyajian Had the Chance

The two bankruptcy adversarial actions, plus the underlying civil suit brought by the Loeff firm, were consolidated and moved to Southern California, where a trial was conducted in front of Judge Lourdes G. Baird. But no adversarial actions were ever filed by Boyajian contesting the dischargeability of any claims he might have against Ordoubadi arising out of the Loeff scheme.

In 1999, Judge Baird gave a judgment in favor of the Loeff firm for some $290,000 against Showrai, Ordoubadi and Boyajian, and the judgment provided for joint and several liability. While the decision details why the debt to the Loeff firm could not be discharged in bankruptcy, it did not address any claims that Boyajian or Ordoubadi might have, or have had, against each other for equitable indemnity. No such claims were presented.

---

[6] Except that all capitalization in the original has been converted to ordinary English capitalization.

Indeed, to this day, Boyajian still asserts on appeal that he had no reason to know he had a future indemnity claim against Ordoubadi back when Ordoubadi filed for bankruptcy. On page 7 of his reply brief, for example, he asserts that he "had no way of knowing he would have a future comparative equitable indemnity claim against Ordoubadi or even that he would be found to be an intentional joint tortfeasor with Ordoubadi." (We will have a little more to say about that assertion anon.)

In any event, Boyajian's strategy of *not* asserting the nondischargeability of his indemnity claim against Ordoubadi didn't work. Judge Baird's written decision found both of them to be not credible, and held them both jointly and severally liable.

### D. The Fallout: Boyajian Pays the Piper and Wants to Share the Pain

We now fast-forward to 2004. Boyajian had apparently come into some assets. Loeff assigned its judgment to a firm known as Mayor Dune, and Mayor Dune levied on Boyajian's bank account for about $111,000. After an abortive action (dismissed for lack of subject matter jurisdiction) in the Central District of California, Boyajian filed, in August of 2006, this lawsuit in Orange County Superior Court for equitable indemnity.

The case came to a court trial in the summer of 2008. While most of the case was tried on documents and stipulated facts, testimony was taken on the issue of whether Boyajian had *notice* of Ordoubadi's bankruptcy and, more particularly, his listing of Boyajian's claim in regard to the Loeff claim against them both. The trial court found the 1994 bankruptcy discharge to be dispositive, and entered judgment against Boyajian. After an unsuccessful new trial motion, Boyajian then timely filed this appeal.

The main argument presented in Boyajian's appeal is this fundamentally legal one: Because Boyajian did not pay any money on the Loeff debt until 2004, he argues that *by definition* he had no claim against Ordoubadi in 1994, when Ordoubadi discharged all his debts save the one to the Loeff firm, and therefore the bankruptcy discharge did not apply to Boyajian's 2006 claim for equitable indemnity based on the 2004 payment.[7]

Judge Fell, of course, thought otherwise. In adjudicating the new trial motion at trial, she asked rhetorically: "The same debt that was discharged in

---

[7] To the degree that Boyajian asserts that Ordoubadi's bankruptcy back in 1993 fraudulently claimed he had no assets, the matter is not for this court. As a state court *we* don't go around setting aside discharges in bankruptcy because a creditor in state court 10 years later posits that a bankruptcy petitioner lied about his assets.

that Chapter 7 bankruptcy is the one that Mr. Boyajian is trying to claim in this case. What have I gotten wrong?"

## II. THE ANALYSIS

As we now explain, Judge Fell got nothing wrong. The 1994 discharge in Ordoubadi's bankruptcy is dispositive.

On appeal, Boyajian's argument goes like this:

(a) Under California law, no cause of action exists for equitable indemnity until the underlying debt or loss is paid.

(b) Nothing was paid here until 2004.

(c) Ergo, it was legally impossible for Boyajian's cause of action against Ordoubadi for equitable indemnity to have been discharged in 1994.

The fallacy in this syllogism is that it equates causes of action with claims.

█ It is indeed true, as Boyajian now asserts, that a cause of action for equitable indemnity does not exist until the underlying loss is paid. (E.g., *People ex rel. Dept. of Transportation v. Superior Court* (1980) 26 Cal.3d 744, 751 [163 Cal.Rptr. 585, 608 P.2d 673] (*Dept. of Transportation*) [it " 'is well settled that a cause of action for implied indemnity does not accrue or come into existence *until the indemnitee* [i.e., the initial defendant] *has suffered actual loss through payment*' " (original italics)]; *U. S. Cold Storage v. Matson Navigation Co.* (1984) 162 Cal.App.3d 1228, 1231 [209 Cal.Rptr. 144] ["Under well-established California law, however, a cause of action for equitable indemnity arises only when the indemnitee actually incurs a loss by payment of the underlying claim or judgment . . . ."].)

The rule, however, is one by which the *statute of limitations* is tested. (See *Dept. of Transportation, supra*, 26 Cal.3d at p. 751.) And just because a cause of action, for purposes of the statute of limitations, does not "exist" until a given future event does not *necessarily* mean that *the claim* on which that cause of action is based cannot be discharged in bankruptcy prior to that future event.

In this regard, we first note that California courts regularly are required to value claims for equitable indemnity prior to actual payment of the underlying debt in the context of good faith settlements; this happens all the time in construction defect cases where, at the beginning, when an owner sues a builder or a developer, claims for equitable (as well as other kinds) of

indemnity fly thick and fast, and eventually parties settle and want protection from future claims for equitable indemnity.[8] For example, in *Fleck v. Bollinger Home Corp.* (1997) 54 Cal.App.4th 926, 933 [63 Cal.Rptr.2d 407], a builder was able to assign a cause of action for equitable indemnity to the owner despite the fact that the builder had not yet paid off the underlying debt: "The trial court did not err in permitting the Bollinger parties [(the builder)] to assign to Fleck [(the owners)] their distinct cause of action for equitable indemnity for the contingent damages it faced as a result of the litigation. . . . *This is so even though actions for indemnity do not typically accrue for the purposes of the statute of limitations until payment of a judgment or settlement.*" (Italics added, citations omitted.)

To the same effect are (1) *Erreca's v. Superior Court* (1993) 19 Cal.App.4th 1475, 1496 [24 Cal.Rptr.2d 156], which involved valuing the indemnity rights against nonsettling defendants ("It is clear that assignment of indemnity rights may constitute a valuable noncash consideration for settlement.") and (2) *Alcal Roofing & Insulation v. Superior Court* (1992) 8 Cal.App.4th 1121, 1127 [10 Cal.Rptr.2d 844], where there was an assignment of a developer's indemnity rights against a roofer to a homeowners association (except there, the court said the parties should have placed a value on the assignment of the rights for purposes of seeking good faith settlement protection).

 Turning to bankruptcy law proper, we first note that the Bankruptcy Code itself is framed in terms of a dischargeable *claim* including a "right to payment" even when that right is "contingent" or "unmatured" or "disputed." (11 U.S.C. § 101(5).)[9]

Thus bankruptcy courts regularly discharge contingent claims, including claims for contribution based on payments yet to be made. For example, in *Boston and Maine Corp. v. Massachusetts Bay Transportation Authority* (1st Cir. 2009) 587 F.3d 89, at the time of the debtor's discharge, a local government entity had a "contingent claim for contribution" based on oil

---

[8] One set of statutes conspicuously absent from any of Boyajian's briefing is sections 875 through 877.6 of the Code of Civil Procedure. We note in passing that section 875, subdivision (d), provides that, as to any money judgment rendered in a tort action against two or more defendants, "There shall be no right of contribution in favor of any tortfeasor who has intentionally injured the injured person."

[9] The text is:

"(5) The term 'claim' means—

"(A) *right to payment*, whether or not such right is reduced to judgment, liquidated, *unliquidated*, fixed, *contingent*, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

"(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." (11 U.S.C. § 101(5), italics added.)

contamination at a particular site (*id.* at p. 98), and the court held the discharge barred the later claim by the entity for contribution.

To be sure, indemnity claims *have* presented, in bankruptcy law, the conundrum, inherent in Boyajian's argument here, that one doesn't know what the future amount of the obligation might be. But, as the First Circuit has noted, courts have proceeded on the premise that the task will simply require some *estimation.* (See *Colonial Surety Co. v. Weizman* (1st Cir. 2009) 564 F.3d 526, 529–530 [noting decisions that "treat contingent claims as intrinsically dischargeable under the present statute, saying that the court must just make the best estimate it can as to the present value of the claim"].)

Closer to home, in the Central District of California, there is a case on point, *In re Motley* (C.D.Cal. 2001) 268 B.R. 237 (*Motley*). In *Motley*, the debtors (a couple) signed, in 1984, a guaranty for a tenant on certain premises. The debtors received a chapter 7 discharge in 1996. When, in 1997, the tenant ceased paying rent, the landlord sued both the tenant and, on their guaranty, the debtors, in state court. The landlord got a judgment against the tenant and the debtors. (Yes, that shouldn't have happened, as the bankruptcy court would later declare.) The landlord then recorded an abstract of the judgment which became a lien against the debtors' residence.

Then the debtors sold their residence, but the buyers' lender wanted a title insurance policy showing the lender's deed of trust was in first position. The title insurer, in turn, wanted an indemnity agreement from the debtors, plus a deposit of money to cover the judgment and accrued interest thereon.

And the debtors signed it. The indemnity agreement provided that if the judgment was not paid off within 120 days from its date, the title company would pay the judgment itself and refund the balance of the deposit to the debtors.

The title company, however, ended up paying the judgment to the landlord out of its own pocket, and then sought reimbursement from the deposited funds it was holding from the debtors.

The debtors then brought a motion in state court to vacate the judgment against them on the grounds that it violated their discharge injunction in their prior bankruptcy case, but the state trial court denied the motion. The debtors filed for bankruptcy again, this time in chapter 11.

In order to get to the question of who owned the deposited funds, the bankruptcy court had to confront the issue of the prior bankruptcy. And it held that the guaranty, given back in 1984, was a prepetition "obligation that was discharged in their prior bankruptcy case." (*Motley, supra*, 268 B.R. at p. 240.) The point was, "At the time that the rent accrued the guaranty was gone." (*Id.* at p. 241.) Added the court, "the state court had no jurisdiction to hold the debtors accountable for their personal guarantee." (*Id.* at p. 242.)

Which brought the court to the indemnity agreement, ironically made after the 1994 discharge, which the debtors had given to the title company. The indemnity agreement obligated the debtors to satisfy the debt that the title company itself had paid. (*Motley, supra*, 268 B.R. at p. 242.) The court held that the debtors could not even contract to pay the discharged debt, the debt had not been resuscitated by a reaffirmation agreement, and so the debtors were entitled to the return of their deposit. (*Id.* at p. 243.)

██ As applied to the case before us, *Motley* is clear. If a postpetition indemnity agreement was unenforceable in *Motley* because it was based on a prepetition guaranty that had been discharged, how much less enforceable is the indemnity obligation in this case, which was actually mentioned in the 1994 bankruptcy.

As alluded to above, Boyajian attempts to distinguish *Motley* on the theory that, unlike the debtors in *Motley* who knew about the obligation to the title company, he "had no way of knowing he would have a future comparative equitable indemnity claim against Ordoubadi or even that he would be found to be an intentional joint tortfeasor with Ordoubadi."

This ground of distinction is feeble indeed. The facts specifically found by Judge Baird included these: Boyajian knew his statements to the Loeff firm about the fictitious Gordon Williams were false and made with the intent of deceiving the Loeff firm, and in particular Boyajian knew Williams didn't exist, knew his alter ego Ordoubadi was not a United States national, yet still actively reassured Sandick about Williams.

In a word, Boyajian had lots of ways of knowing that he would be found to be an intentional joint tortfeasor with Ordoubadi. He was in on the scheme to dupe the Loeff firm.

The judgment is, accordingly, affirmed. With a bit of reluctance, we award costs to Ordoubadi, who at least didn't bring a borderline frivolous suit to the state courts.

Moore, J., and Ikola, J., concurred.